Allen NIXON, Harry Matlock, Roy Jolly, Floyd Schisler, Doyle Roach, Doyle Gilliam, John Milbourn, Tony Futrell, Edward Wiseman, Harold Bouland and E.C. Barton & Company, a Delaware corporation, Defendants Below, Appellants,

v.

Guy C. BLACKWELL, Guy C. Blackwell, III, Carolyn Mai Blackwell, Nancy Ann Blackwell, Trustee for Guy C. Blackwell, III, Nancy Ann Blackwell, Trustee for Carolyn Mai Blackwell, Mai Banks Blackwell, Executrix of the Estate of G. Lawrence Blackwell, Lea Ellen Blackwell, O.G. Blackwell, III, Dr. O.G. Blackwell, Custodian for Claire Black-

---

well, Laurie Blackwell Black, Janet Porter Blackwell, Dr. O.G. Blackwell, Thomas M. Bizzell, Trustee for Nancy Jane Lauck and Amanda Ann Lauck and St. Timothy Episcopal Church, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted on Oral Argument before a panel of the Court: Nov. 17, 1992.

Resubmitted on Oral Argument before the Court en Banc: Jan. 12, 1993.

Resubmitted to newly-constituted[1] Court en Banc: June 7, 1993.

Decided: June 22, 1993.

Rehearing Denied July 28, 1993.

1. This matter was submitted on oral argument before the Court *en Banc* on January 12, 1993, at which time the Court was comprised of Veasey, Chief Justice, Horsey, Moore, and Walsh, Justices and Christie, retired Chief Justice (sitting by designation pursuant to Article IV §§ 12 and 38, Justice Holland having previously recused himself). Tragically, retired Chief Justice Christie was killed in an automobile accident on May 28, 1993, before a decision in this matter could be rendered. By Order dated June 7, 1993, the Honorable Henry duPont Ridgely, President Judge of the Superior Court was designated to sit on the Court in place of retired Chief Justice Christie and the matter was, by operation of that Order, resubmitted without the need for further oral argument to the newly-constituted Court *en Banc* as of June 7, 1993, on the basis of the briefs, and the tape and the transcript of the oral argument before the Court *en Banc* as then constituted on January 12, 1993.

Grover C. Brown (argued), P. Clarkson Collins, Jr. of Morris, James, Hitchens & Williams, Wilmington, Tom D. Womack of Barrett, Wheatley, Smith and Deacon, Jonesboro, AR, and A. Wyckliff Nisbet of Friday, Eldredge & Clark, Little Rock, AR, for appellants.

David A. Drexler (argued), of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees.

Before VEASEY, C.J., HORSEY, MOORE, and WALSH, JJ., and RIDGELY, President Judge (sitting by designation pursuant to art. IV, § 12), constituting the Court en Banc.

VEASEY, Chief Justice:

In this action we review a decision of the Court of Chancery holding that the defendant directors of a closely-held corporation breached their fiduciary duties to the plaintiffs by maintaining a discriminatory policy

that unfairly favors employee stockholders over plaintiffs. The Vice Chancellor found that the directors treated the plaintiffs unfairly by establishing an employee stock ownership plan ("ESOP") and by purchasing key man life insurance policies to provide liquidity for defendants and other corporate employees to enable them to sell their stock while providing no comparable liquidity for minority stockholders. We conclude that the Court of Chancery applied erroneous legal standards and made findings of fact which were not the product of an orderly and logical deductive reasoning process. Accordingly, we REVERSE and REMAND to the Court of Chancery for proceedings not inconsistent with this opinion.

## I. FACTS

This case involved a five-day trial before the Vice Chancellor. The record is detailed, but only a brief discussion of the salient facts is necessary to an understanding of the issues before us.

### A. The Parties

Plaintiffs are 14 minority stockholders of Class B, non-voting, stock of E.C. Barton & Co. (the "Corporation"). The individual defendants are the members of the board of directors (the "Board" or the "directors"). The Corporation is also a defendant. Plaintiffs collectively own only Class B stock, and own no Class A stock. Their total holdings comprise approximately 25 percent of all the common stock outstanding as of the end of fiscal year 1989.

At all relevant times, the Board consisted of ten individuals who either are currently employed, or were once employed, by the Corporation. At the time this suit was filed, these directors collectively owned approximately 47.5 percent of all the outstanding Class A shares. The remaining Class A shares were held by certain other present and former employees of the Corporation.

2. The Internal Revenue Service valued the stock at $45 per share at the time of Mr. Barton's

### B. Mr. Barton's Testamentary Plan

The Corporation is a non-public, closely-held Delaware corporation headquartered in Arkansas. It is engaged in the business of selling wholesale and retail lumber in the Mississippi Delta. The Corporation was formed in 1928 by E.C. Barton ("Mr. Barton") and has two classes of common stock: Class A voting stock and Class B non-voting stock. Substantially all of the Corporation's stock was held by Mr. Barton at the time of his death in 1967. Mr. Barton was survived by his second wife, Martha K. Barton ("Mrs. Barton") who died in 1985, and by Dorothy B. Rebsamen and Mary Lee Marcom, his daughter and granddaughter, respectively, from his first marriage. Pursuant to Mr. Barton's testamentary plan, 49 percent of the Class A voting stock was bequeathed outright to eight of his loyal employees. The remaining 51 percent, along with 14 percent of the Class B non-voting stock, was placed into an independently managed 15–year trust for the same eight people. Sixty-one percent of the Class B non-voting stock was bequeathed outright to Mrs. Barton. Mr. Barton's daughter and granddaughter received 21 percent of the Class B stock in trust. The non-voting Class B shares Mr. Barton bequeathed to his family represented 75 percent of the Corporation's total equity.

Ownership interests in the Corporation began to change in the early 1970s following the distribution of Mr. Barton's estate. Mrs. Barton gave certain shares of Class B non-voting stock to her three children, Guy C. Blackwell, Owen G. Blackwell and Martha G. Hestand (the "children"). In 1973 the Corporation purchased all of the Class B stock held in trust for Mr. Barton's daughter and granddaughter at a price of $45 per share.[2] Mrs. Barton sold the remainder of her Class B shares to the Corporation in January 1975 at a price of $45 per share. These transactions left Mrs. Barton's three children collectively with 30 percent of the outstanding Class B non-

death.

voting stock. The children have no voting rights despite their substantial equity interest in the Corporation. The children are also the only non-employee Class B stockholders.

There is no public market for, or trading in, either class of the Corporation's stock. This creates problems for stockholders, particularly the Class B minority stockholders, who wish to sell or otherwise realize the value of their shares. The corporation purported to address this problem in several ways over the years.

## C. The Self–Tenders

The Corporation occasionally offered to purchase the Class B stock of the non-employee stockholders through a series of self-tender offers. During the late 1970s the Corporation attempted to purchase the outstanding Class B shares held by Guy C. Blackwell, Owen G. Blackwell and Martha G. Hestand, the Corporation's only non-employee stockholders. The Corporation first offered to repurchase the children's stock at $45 per share shortly after they acquired it from Mrs. Barton. The children rejected the offer and the stock subsequently split 25–for–1 in 1976. A second unsuccessful repurchase offer was made in 1977. At that time, the Corporation offered the children $8.22 per share. In light of the stock split, this price appears to be approximately four times the amount the Corporation paid for Mrs. Barton's Class B shares three years earlier. In 1979 the Corporation again approached the children and offered to repurchase their stock at a price of $15 per share. Martha Hestand accepted the offer and tendered her shares to the Corporation. Guy and Owen Blackwell, however, refused to sell their shares at that price. The Corporation made no further repurchase offers until May 1985, when the ESOP undertook a tender offer to repurchase 48,000 shares of Class B stock, concurrently with a tender offer by the Corporation for 39,000 Class A and 100,000 Class B shares at a price of $25 per share. The book value of the Class A

stock and the Class B stock at that time was $38.39 and $26.35, respectively. The remaining children and the other plaintiffs in the present action refused to sell.[3]

## D. The Employee Stock Ownership Plan ("ESOP")

In November 1975 the Corporation established an ESOP designed to hold Class B non-voting stock for the benefit of eligible employees of the Corporation. The ESOP is a tax-qualified profit-sharing plan whereby employees of the Corporation are allocated a share of the assets held by the plan in proportion to their annual compensation, subject to certain vesting requirements. The ESOP is funded by annual cash contributions from the Corporation. Under the plan, terminating and retiring employees are entitled to receive their interest in the ESOP by taking Class B stock or cash in lieu of stock. It appears from the record that most terminating employees and retirees elect to receive cash in lieu of stock. The Corporation commissions an annual appraisal of the Corporation to determine the value of its stock for ESOP purposes. Thus, the ESOP provides employee Class B stockholders with a substantial measure of liquidity not available to non-employee stockholders. The Corporation had the option of repurchasing Class A stock from the employees upon their retirement or death. The estates of the employee stockholders did not have a corresponding right to put the stock to the Corporation.

## E. The Key Man Insurance Policies

The Corporation also purchased certain key man life insurance policies with death benefits payable to the Corporation. Several early policies insuring the lives of key executives and directors were purchased during Mr. Barton's lifetime with death benefits payable to the Corporation. In 1982 the Corporation purchased additional key man policies in connection with agreements entered into between the Corporation and nine key officers and directors. Each executive executed an agreement giv-

---

**3.** The record does not clearly reveal the relationship of the various tender offer prices to the current fair value of the stock measured by any traditional valuation method.

ing the Corporation a call option to substitute Class B non-voting stock for their Class A voting stock upon the occurrence of certain events, including death and termination of employment, so that the voting shares could be reissued to new key personnel. In return, the Board adopted a resolution creating a non-binding recommendation that a portion of the key man life insurance proceeds be used to repurchase the exchanged Class B stock from the executives' estates at a price at least equal to 80 percent of their ESOP value. The minutes of a special meeting of the Board on June 26, 1982, provide:

> BE IT RESOLVED that the Board of Directors of E.C. Barton & Company recommends and strongly urges the E.C. Barton & Company Employee Stock Ownership Plan Committee and the Trustees of the E.C. Barton & Company Employee Stock Ownership Trust, upon receipt of life insurance funds, resulting from the death of any one of the said nine controlling Class "A" stockholders, that said life insurance funds be used as next set out: 40% for the purchase of shares of E.C. Barton & Company stock from the estate of the deceased stockholder; 35% for the purchase of shares of E.C. Barton & Company stock from the remaining controlling Class "A" stockholders on a prorata basis; 25% retained by the Employee Stock Ownership Trust for liquidity....

Despite the strong recommendation, the ultimate decision on the use of insurance proceeds for this purpose was left to the discretion of the Corporation's management or the Board.

In 1985 the Corporation purchased eight $300,000 keyman life insurance policies and adopted a plan in connection with its June self-tender. The Corporation's tender offer was for both Class A and Class B stock. The intended use for the proceeds of the keyman life insurance policies was to fund the retirement of any unpaid principal and interest on promissory notes issued in payment for Class A stock acquired in one of the self-tenders. A resolution of the Board facilitating this end was unanimously adopted at the December 17, 1985 meeting. The minutes of that meeting provide:

> IT IS THEREFORE RESOLVED that the death benefits inuring to the Company from the proceeds of the [eight keyman] insurance policies shall first be applied to the unpaid balance of principal and interest of the Promissory Note issued in June of 1985 to the deceased, and the balance of said proceeds prorated and applied to the unpaid principal and/or interest of such Promissory Notes held by the survivors of the aforementioned insured key men.

In the five-year period, 1985 to 1989, the Corporation paid approximately $450,000 in net key man premiums. The premiums exceeded the Corporation's declared dividends in 1986 and 1989, even after the earnings on the policies were deducted (1986—premiums, $146,614, dividends, $93,-133; 1989—premiums, $144,704, dividends, $143,374). The reasonableness and significance of these facts is not clear in the record or the findings of the trial court.

The record and the findings of the trial court are not precisely clear on the issue of corporate benefit compared with individual benefit to the defendants with respect to the proceeds of the key man insurance policies. The death benefits of such policies, as here, are normally payable to the Corporation and are designed to benefit the Corporation by providing some measure of compensation for the loss of productive corporate executives. Here the two resolutions recited above show a desire to earmark the proceeds. On the death of each individual, the 1985 resolution would apply the proceeds to liquidation of at least part of the corporate debt (i.e., the corporate promissory note issued to the deceased in connection with that employee's previous tender of stock). Certainly that would provide "liquidity" to the employee's estate by paying off a corporate debt, but presumably that obligation was owing in any event and was a liability on the corporate balance sheet. Liquidation of it would improve the corporate balance sheet and would also put cash in the hands of the employee's estate.

The analysis of this issue would seem to call for a disciplined balancing test by a court reviewing the matter for entire fairness. As we note hereafter, we find such an analysis to be lacking in the trial court's opinion.

### F. Dividend Policy and Compensation

The Board from time to time paid modest dividends. Because the earnings were solid in many years and dividends relatively low, the retained earnings of the Corporation continued to increase at a relatively high level. Plaintiffs challenged these corporate decisions as unfair to the minority. There was also a challenge at trial by plaintiffs to the compensation level of the defendants. In view of the ruling of the Vice Chancellor in defendants' favor on the dividend policy and against the plaintiffs on the claim of excessive compensation, from which rulings no appeal was taken by plaintiffs, there is no need to detail the facts relating to those issues, except to the extent, hereinafter discussed, that the trial court referred to the dividend policy in connection with other issues or fairness generally.

### II. PROCEEDINGS IN THE COURT OF CHANCERY

The evidence at trial included live witness testimony, depositions, and documents.

At trial, the plaintiffs charged the defendants with (1) attempting to force the minority stockholders to sell their shares at a discount by embarking on a scheme to pay negligible dividends, (2) breaching their fiduciary duties by authorizing excessive compensation for themselves and other employees of the Corporation, and (3) breaching their fiduciary duties by pursuing a discriminatory liquidity policy that favors employee stockholders over non-employee stockholders through the ESOP and key man life insurance policies. The plaintiffs sought money damages for past dividends, a one-time liquidity dividend, and a guarantee of future dividends at a specified rate.

The Vice Chancellor held that the Corporation's low-dividend policy was within the bounds of business judgment, that the executive compensation levels were not excessive, and ruled in favor of defendants on these issues. The Vice Chancellor further held, however, that the defendant directors had breached their fiduciary duties to the minority. The basis for this ruling was that it was "inherently unfair" for the defendants to establish the ESOP and to purchase key man life insurance to provide liquidity for themselves while providing no comparable method by which the non-employee Class B stockholders may liquidate their stock at fair value. Holding that the "needs of all stockholders must be considered and addressed when providing liquidity," the court ruled that the directors breached their fiduciary duties, and granted relief to plaintiffs. (Slip op. at 13). The trial court ruled against the plaintiffs on all the other issues. Since plaintiffs have not appealed those rulings, they are not before this Court.

The finding for the plaintiffs and the form of the relief granted to the plaintiffs (which the defendants also contest) are set forth in paragraphs 4 and 5 of the Order and Final Judgment of March 10, 1992:

4. On the claim of the plaintiffs presented at trial that the individual defendants breached their fiduciary duty as directors and treated the plaintiffs unfairly as the non-employee, minority Class B stockholders of the Company by providing no method by which plaintiffs might liquidate their stock at fair value while providing a means through the ESOP and key-man life insurance whereby the stock of terminating employees could be purchased from them, judgment is entered in favor of the plaintiffs.

5. Pursuant to the judgment entered in paragraph 4 above, defendants shall take the following steps in order to remedy the unfair treatment of Class B stockholders:

a. An amount equal to the total of all key man life insurance premiums paid to date, together with interest from the date of payment shall be used to repurchase Class B stock other than shares held by the ESOP or defen-

dants, at a price to be set by an independent appraiser.

b. Hereafter, *neither the ESOP* [4] *nor the company shall purchase or repurchase any stock without offering to purchase the same number of shares, on the same terms and conditions, from the Class B stockholders other than defendants and the ESOP.*

Plaintiffs were awarded attorneys' fees and costs in a subsequent order entered on May 20, 1992.

## III. RATIONALE OF THE VICE CHANCELLOR'S DECISION

The theory of this case when it was commenced was based upon allegations relating to the payment of low dividends, the retention of excessive amounts of cash by the Corporation, excessive contribution to its ESOP, and a conspiracy by the Board to depress the value of the Corporation's stock. During the trial, the plaintiffs added new charges that the defendant employees had been paid excessive compensation, that the defendant directors had breached their fiduciary duties by failing to put in place a plan to enable Class B stockholders to sell their stock at a price fixed by an independent appraiser, and that the defendants failed to provide liquidity equivalent to that which was allegedly provided to the defendants through the ESOP and the key man life insurance program of the Corporation.[5]

The only issue before this Court is the ruling by the trial court as implemented in its judgment and final order that the defendants breached their fiduciary duties by failing to provide a parity of liquidity. The theory of the trial court on this issue is based upon the fact that, as directors, defendants approved the ESOP and the key man life insurance program, both of which had the effect of benefiting them as employees, with no corresponding benefit to plaintiffs. Thus, the trial court reasoned,

defendants are on both sides of the transaction and the business judgment rule does not apply. Therefore, defendants have the burden of showing the entire fairness of their actions on these issues, which burden the Vice Chancellor held they had not carried.

The following portions of the opinion of the trial court are crucial to the determination of the issues on appeal:

The inquiry does not end, however, with a finding that defendants have not been overcompensated. They have paid low dividends over the years and have attempted to justify high levels of retained earnings in part as a means of promoting the company's growth. If defendants' focus is on appreciation in the value of the company's stock as opposed to the payment of more than minimal dividends, it would be logical to assume that defendants had or were developing a plan that would enable the company's stockholders to realize the increased value of their shares. No such general plan has been adopted, however, and the few steps defendants have taken demonstrate the validity of plaintiffs' claim of unfair treatment.

All Barton stockholders face the same liquidity problem. If they are to sell their shares, they must persuade defendants to authorize a repurchase by the company. The stockholders have no bargaining power and must accept whatever terms are dictated by defendants or retain their stock. If the stockholder is pressed for cash to pay estate taxes, for example, as has happened more than once, the stockholder is entirely at defendants' mercy. Defendants recognized their employee stockholders' liquidity needs when they established the ESOP. As noted previously, employees have the option of taking cash in lieu of the shares allocated to their accounts. Moreover, the disparity in bargaining position is

---

**4.** It is to be noted that the ESOP is not a party to the proceedings, so in all events this relief is void to the extent that it purports to bind the ESOP.

**5.** There is no contention by defendants that they were prejudiced by the fact that the issues were tried without having been raised by the pleadings. They appear to have been tried by express or implied consent of the parties. *See* Chancery Court Rule 15(b).

eliminated for employee stockholders because the cash payment is determined on the basis of an annual valuation made by an independent party. *No similar plan or arrangement has been put into place with respect to the Class B stockholders. There is no point in time at which they can be assured of receiving cash for all or any portion of their holdings at a price determined by an independent appraiser.*

Defendants have gone one step farther in addressing their own liquidity problems. Their ESOP allocation may be handled in the same manner as other employees. However, defendants are substantial stockholders independent of their ESOP holdings. *In order to solve defendants' own liquidity problem, the company has been purchasing key man life insurance since at least 1982. The proceeds will help assure that Barton is in a position to purchase all of defendants' stock at the time of death.* In 1989, the premium cost for the key man insurance was slightly higher than the total amount paid in dividends for the year.

*While the purchase of key man life insurance may be a relatively small corporate expenditure, it is concrete evidence that defendants have favored their own interests as stockholders over plaintiffs'. It also makes one wonder whether the decisions to accumulate large amounts of cash and pay low dividends were not also at least partially motivated by self-interest.* The law is settled that fiduciaries may not benefit themselves at the expense of the corporation, *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939), and that, when directors make self-interested decisions, they must establish the entire fairness of those decisions. *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 710 (1983).

*I find it inherently unfair for defendants to be purchasing key man life insurance in order to provide liquidity for themselves while providing no method by which plaintiffs may liquidate their stock at fair value. By this ruling, I am not suggesting that there*

*is some generalized duty to purchase illiquid stock at any particular price. However, the needs of all stockholders must be considered and addressed when decisions are made to provide some form of liquidity. Both the ESOP and the key man insurance provide some measure of liquidity, but only for a select group of stockholders. Accordingly, I find that relief is warranted.* Blackwell v. Nixon, Del.Ch., C.A. No. 9041, Berger, V.C. (Sept. 26, 1991) at pp. 10–13, 1991 WL 194725 (footnotes omitted; emphasis supplied).

## IV. SCOPE AND STANDARD OF REVIEW

■ The threshold question is the applicable standard by which the defendants' conduct is to be judged. This is a legal question and therefore is subject to *de novo* review by this Court. *Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del. Supr., 445 A.2d 927, 930 (1982). The ultimate determination of the trial court involved mixed questions of fact and law. The trial court made findings of fact upon which its conclusion that defendants had violated their fiduciary duties was predicated. This Court reviews the entire record and the sufficiency of evidence to test the propriety of those findings, and will review the factual findings of the trial court to determine if they are sufficiently supported by the record and are the product of an orderly and logical deductive process. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 871 (1985).

## V. APPLICABLE PRINCIPLES OF SUBSTANTIVE LAW

■ Defendants contend that the trial court erred in not applying the business judgment rule. Since the defendants benefited from the ESOP and could have benefited from the key man life insurance beyond that which benefited other stockholders generally, the defendants are on both sides of the transaction. For that reason, we agree with the trial court that the entire fairness test applies to this aspect of the

case. Accordingly, defendants have the burden of showing the entire fairness of those transactions. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717 (1971) (*"Levien"*); *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701 (1983) (*"Weinberger"*).

> When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.... The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.

*Weinberger,* 457 A.2d at 710.

*Weinberger* explains further the two aspects of entire fairness, fair price and fair dealing:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.... All aspects of the issue must be examined as a whole since the question is one of entire fairness.

*Id.* at 711. The case before us involves only the issue of fair dealing.

■ It is often of critical importance whether a particular decision is one to which the business judgment rule applies or the entire fairness rule applies. It is

sometimes thought that the decision whether to apply the business judgment rule or the entire fairness test can be outcome-determinative.

> [B]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of derivative litigation.

*Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1988) (*"MacMillan"*) (quoting *AC Acquisitions v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 111 (1986) (*"Anderson, Clayton"*)). Application of the entire fairness rule does not, however, always implicate liability of the conflicted corporate decisionmaker, nor does it necessarily render the decision void.[6]

■ The entire fairness analysis essentially requires "judicial scrutiny." *Weinberger,* 457 A.2d at 710. In business judgment rule cases, an essential element is the fact that there has been a business decision made by a disinterested and independent corporate decisionmaker. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872–73 (1985). When there is no independent corporate decisionmaker,[7] the court may become the objective arbiter. *Marciano,* 535 A.2d at 404.

■ The trial court in this case, however, appears to have adopted the novel legal principle that Class B stockholders had a right to "liquidity" equal to that which the court found to be available to the defendants. It is well established in our jurisprudence that stockholders need not always be treated equally for all purposes. *See Unocal Corp. v. Mesa Petroleum Co.,*

---

6. *See* 8 *Del.C.* § 144; *Marciano v. Nakash,* Del. Supr., 535 A.2d 400, 403–05 (1987) (*"Marciano"*) (loans made to a corporation by its half owners with the bona fide intention of assisting the corporation are valid and enforceable debts notwithstanding their origin in self-dealing); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985) (arm's length bargaining is considered to be strong evidence of the fairness of a merger

ratio). *But see, Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099 (1985) (a corporation that manipulated the timing of a proposed merger to avoid certain commitments rendered the transaction unfair).

7. This could be a disinterested and independent majority of the board of directors or the stockholders. *See Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976).

Del.Supr., 493 A.2d 946, 957 (1985) ("*Unocal*") (discriminatory exchange offer held valid); and *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554–56 (1964) (selective stock repurchase held valid). To hold that fairness necessarily requires precise equality is to beg the question:

> Many scholars, though few courts, conclude that one aspect of fiduciary duty is the equal treatment of investors. Their argument takes the following form: fiduciary principles require fair conduct; equal treatment is fair conduct; hence, fiduciary principles require equal treatment. The conclusion does not follow. The argument depends on an equivalence between *equal* and *fair* treatment. To say that fiduciary principles require equal treatment is to beg the question whether investors would contract for equal or even equivalent treatment.

Frank H. Easterbrook and Daniel R. Fischel, *The Economic Structure of Corporate Law* 110 (1991) (emphasis in original). This holding of the trial court overlooks the significant facts that the minority stockholders were not: (a) employees of the Corporation; (b) entitled to share in an ESOP; (c) qualified for key man insurance; or (d) protected by specific provisions in the certificate of incorporation, by-laws, or a stockholders' agreement.

■ There is support in this record for the fact that the ESOP is a corporate benefit and was established, at least in part, to benefit the Corporation.[8] Generally speaking, the creation of ESOPs is a normal corporate practice and is generally thought to benefit the corporation.[9] The same is true generally with respect to key man insurance programs.[10] If such corporate practices were necessarily to require equal treatment for non-employee stockholders, that would be a matter for legislative determination in Delaware. There is no such legislation to that effect. If we were to adopt such a rule, our decision would border on judicial legislation. *See Providence & Worcester Co. v. Baker*, Del.Supr., 378 A.2d 121, 124 (1977).

■ Accordingly, we hold that the Vice Chancellor erred as a matter of law in concluding that the liquidity afforded to the employee stockholders by the ESOP and the key man insurance required substantially equal treatment for the non-employee stockholders. Moreover, the Vice Chancellor failed to evaluate and articulate, for example, whether or not and to what extent (a) corporate benefits flowed from the ESOP and the key man insurance; (b) the ESOP and key man insurance plans are novel, extraordinary, or relatively routine business practices; (c) the dividend policy was even relevant;[11] (d) Mr. Barton's plan for employee management and benefits

---

**8.** Trial Transcript ("Tr.") at 42–45.

**9.** *See Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 257, 271–76 (1989) (properly adopted ESOP can be fair even if it has anti-takeover consequences). *See also* Henry C. Blackiston III, Linda E. Rappaport, and Lawrence A. Pasini, *ESOPs: What They Are and How They Work*, 45 Bus.Law. 85 (1989).

**10.** Tr. at 144.

**11.** The trial court held that no proper claim had been established by plaintiffs relating to the Board's dividend policy. Yet, in the court's opinion, the following references appear:

> If defendants' focus is on appreciation in the value of the company's stock as opposed to the payment of more than minimal dividends, it would be logical to assume that defendants had or were developing a plan that would enable the company's stockholders to realize the increased value of their shares. No such general plan has been adopted, however, and the few steps defendants have taken demonstrate the validity of plaintiffs' claim of unfair treatment.

Slip op. at 11.

> While the purchase of key man life insurance may be a relatively small corporate expenditure, it is concrete evidence that defendants have favored their own interests as stockholders over plaintiffs'. It also *makes one wonder* whether the decisions to accumulate large amounts of cash and pay low dividends were not also at least partially motivated by *self-interest*.

Slip op. at 12 (emphasis supplied). Since the trial court found that the dividend policy was not per se actionable, it is difficult to see how this fact can be resuscitated for another purpose. Moreover, use of the vague phrase "makes one wonder" is not particularly helpful. The opinion thus does not set forth an orderly and logical deductive reasoning process.

should be honored;[12] and (e) the self-tenders showed defendants' willingness to provide an exit opportunity for the plaintiffs.[13]

In a case where the court is scrutinizing the fairness of a self-interested corporate transaction the court should articulate the standards which it is applying in its scrutiny of the transactions. These standards are not carved in stone for all cases because a court of equity must necessarily have the flexibility to deal with varying circumstances and issues. Yet, the standards must be reasonable, articulable, and articulated. While the court is not expected to substitute its business judgment for that of the directors in areas where particular business expertise is an ingredient of the decision,[14] the reasonableness of the business judgment of the conflicted directors' decision must be examined searchingly through a principled and disciplined analysis. The decision of the trial court did not plainly delineate and articulate findings of fact and conclusions of law so that this Court, as the reviewing court, could fathom without undue difficulty the bases for the trial court's decision.[15] The court's decision should not be the product solely of subjective, reflexive impressions based primarily on suspicion[16] or what has sometimes been called the "smell test."[17]

---

**12.** The composition of the Board arises out of extremely rare circumstances. Mr. Barton, the Corporation's late founder, sought to perpetuate the ownership and direction of the Corporation in the hands of the employees through a testamentary plan that bequeathed all of the Class A and a portion of the Class B stock to certain loyal employees. The testamentary disposition resulted in the formation of a completely inside board. Such a board is not particularly a model of modern corporate governance, but this history may be relevant to the fairness equation in this particular case.

**13.** The defendants argue that they demonstrated their fairness by the device of the self-tender offers. The record is unclear, and the trial court's opinion is unhelpful, however, on the extent to which these self-tender offers would have provided fair value to the minority stockholders.

**14.** *See Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 926–28, 393 N.E.2d 994, 1000–002 (1979) (courts are "ill-equipped" to make business decisions).

**15.** To be sure, the trial court undertook to explain its rulings in a written opinion, so that our criticism of the court's ruling is not that there was *no* written basis for the decision. *See Redden v. McGill,* Del.Supr., 549 A.2d 695 (1988). Our concern is that the written decision is imprecise, and the same principles of appellate review apply:

> In order for this Court to discharge its appellate responsibilities it must be supplied with the bases for the decision of the trial court. A decision without reasons borders on the arbitrary and is not subject to meaningful review. This Court has repeatedly cautioned trial courts on the need to supply reasons for their rulings.

*Id.* at 698.

**16.** We note that the Vice Chancellor, as the trier of fact, expressed what can best be described as "suspicions" about the motivation for the key man insurance. Slip op. at 12, quoted *supra* at pp. 1374–1375. This Court respects and gives deference to findings of fact by trial courts when supported by the record, and when they are the product of an orderly and logical deductive reasoning process, especially when those findings are based in part on testimony of live witnesses whose demeanor and credibility the trial judge has had the opportunity to evaluate. Footnote 3 at page 12 of the Vice Chancellor's opinion is a demonstration of credibility issues properly left to the trial court, but otherwise the crucial findings in the Vice Chancellor's opinion are somewhat vague and the opinion does not crisply and clearly set forth findings of fact in a form which we believe is entitled to such deference. *See* pages 1377–1378, *supra.* Thus, we hold that these findings are not the product of an orderly and logical deductive reasoning process.

**17.** We are mindful of the elasticity inherent in equity jurisprudence and the traditional desirability in certain equity cases of measuring conduct by the "conscience of the court" and disapproving conduct which offends or shocks that conscience. Yet one must be wary of equity jurisprudence which takes on a random or ad hoc quality.

> Equity is a rougish [sic] thing. For Law we have to measure, know what to trust to; Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so it Equity. 'Tis all one as if they should make the standard for the measure we call a "foot" a Chancellor's foot; what an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in the Chancellor's conscience.
>
> John Selden, 1584–1654
> "Equity," Table–Talk, 1689

*The Quotable Lawyer* 97 (David S. Shrager and Elizabeth Frost eds., 1986).

■ We hold on this record that defendants have met their burden of establishing the entire fairness of their dealings with the non-employee Class B stockholders, and are entitled to judgment. The record is sufficient to conclude that plaintiffs' claim that the defendant directors have maintained a discriminatory policy of favoring Class A employee stockholders over Class B non-employee stockholders is without merit. The directors have followed a consistent policy originally established by Mr. Barton, the founder of the Corporation, whose intent from the formation of the Corporation was to use the Class A stock as the vehicle for the Corporation's continuity through employee management and ownership.

Mr. Barton established the Corporation in 1928 by creating two classes of stock, not one, and by holding 100 percent of the Class A stock and 82 percent of the Class B stock. Mr. Barton himself established the practice of purchasing key man life insurance with funds of the Corporation to retain in the employ of the Corporation valuable employees by assuring them that, following their retirement or death, the Corporation will have liquid assets which could be used to repurchase the shares acquired by the employee, which shares may otherwise constitute an illiquid and unsalable asset of his or her estate. Another rational purpose is to prevent the stock from passing out of the control of the employees of the Corporation into the hands of family or descendants of the employee.

■ The directors' actions following Mr. Barton's death are consistent with Mr. Barton's plan. An ESOP, for example, is normally established for employees. Accordingly, there is no inequity in limiting ESOP benefits to the employee stockholders. Indeed, it makes no sense to include non-employees in ESOP benefits. The fact that the Class B stock represented 75 percent of the Corporation's total equity is irrelevant to the issue of fair dealing. The Class B stock was given no voting rights because those stockholders were not intended to have a direct voice in the management and operation of the Corporation. They were simply passive investors—entitled to be treated fairly but not necessarily to be treated equally. The fortunes of the Corporation rested with the Class A employee stockholders and the Class B stockholders benefited from the multiple increases in value of their Class B stock. Moreover, the Board made continuing efforts to buy back the Class B stock.

We hold that paragraphs 4 and 5 of the March 10, 1992 order of the trial court and the order of May 20, 1992, awarding fees and costs to plaintiffs, are reversed and remanded with instructions to conform the judgment to the findings and conclusions in this opinion.

## VI. NO SPECIAL RULES FOR A "CLOSELY–HELD CORPORATION" NOT QUALIFIED AS A "CLOSE CORPORATION" UNDER SUBCHAPTER XIV OF THE DELAWARE GENERAL CORPORATION LAW.

■ We wish to address one further matter which was raised at oral argument before this Court: Whether there should be any special, judicially-created rules to "protect" minority stockholders of closely-held Delaware corporations.[18]

The case at bar points up the basic dilemma of minority stockholders in receiving fair value for their stock as to which there is no market and no market valuation. It is not difficult to be sympathetic, in the abstract, to a stockholder who finds himself or herself in that position. A stockholder who bargains for stock in a closely-held corporation and who pays for those shares (unlike the plaintiffs in this case who acquired their stock through gift) can

---

**18.** *Compare* Robert B. Thompson, *The Shareholder's Cause of Action for Oppression,* 48 Bus. Law. 699 (1993) and F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Close Corporations: Law and Practice,* §§ 8.07–8.09 (3d ed. 1987) (favoring court formulation of a special rule protecting the minority from oppression) *with* Frank H. Easterbrook and Daniel R. Fischel, *The Economic Structure of Corporate Law* 228–52 (1991) (noting that "courts have found the equal opportunity rule ... impossible to administer," *id.* at 247).

make a business judgment whether to buy into such a minority position, and if so on what terms. One could bargain for definitive provisions of self-ordering permitted to a Delaware corporation through the certificate of incorporation or by-laws by reason of the provisions in 8 *Del.C.* §§ 102, 109, and 141(a). Moreover, in addition to such mechanisms, a stockholder intending to buy into a minority position in a Delaware corporation may enter into definitive stockholder agreements, and such agreements may provide for elaborate earnings tests, buy-out provisions, voting trusts, or other voting agreements. *See, e.g.,* 8 *Del.C.* § 218; *Sonitrol Holding Co. v. Marceau Investissements,* Del.Supr., 607 A.2d 1177 (1992).

The tools of good corporate practice are designed to give a purchasing minority stockholder the opportunity to bargain for protection before parting with consideration. It would do violence to normal corporate practice and our corporation law to fashion an ad hoc ruling which would result in a court-imposed stockholder buy-out for which the parties had not contracted.

■■■ In 1967, when the Delaware General Corporation Law was significantly revised, a new Subchapter XIV entitled "Close Corporations; Special Provisions," became a part of that law for the first time. While these provisions were patterned in theory after close corporation statutes in Florida and Maryland, "the Delaware provisions were unique and influ-

enced the development of similar legislation in a number of other states...." *See* Ernest L. Folk, III, Rodman Ward, Jr., and Edward P. Welch, 2 *Folk on the Delaware General Corporation Law* 404 (1988). Subchapter XIV is a narrowly constructed statute which applies only to a corporation which is designated as a "close corporation" in its certificate of incorporation, and which fulfills other requirements, including a limitation to 30 on the number of stockholders, that all classes of stock have to have at least one restriction on transfer, and that there be no "public offering." 8 *Del.C.* § 342. Accordingly, subchapter XIV applies only to "close corporations," as defined in section 342. "Unless a corporation elects to become a close corporation under this subchapter in the manner prescribed in this subchapter, it shall be subject in all respects to this chapter, except this subchapter." 8 *Del.C.* § 341. The corporation before the Court in this matter, is not a "close corporation." Therefore it is not governed by the provisions of Subchapter XIV.[19]

One cannot read into the situation presented in the case at bar any special relief for the minority stockholders in this closely-held, but not statutory "close corporation" because the provisions of Subchapter XIV relating to close corporations and other statutory schemes [20] preempt the field in their respective areas. It would run counter to the spirit of the doctrine of independent legal significance,[21] and would be in-

---

**19.** We do not intend to imply that, if the Corporation had been a close corporation under Subchapter XIV, the result in this case would have been different.

> [S]tatutory close corporations have not found particular favor with practitioners. Practitioners have for the most part viewed the complex statutory provisions underlying the purportedly simplified operational procedures for close corporations as legal quicksand of uncertain depth and have adopted the view that the objectives sought by the subchapter are achievable for their clients with considerably less uncertainty by cloaking a conventionally created corporation with the panoply of charter provisions, transfer restrictions, by-laws, stockholders' agreements, buy-sell arrangements, irrevocable proxies, voting trusts or other contractual mechanisms which were and remain the traditional method for accom-

plishing the goals sought by the close corporation provisions.

David A. Drexler, Lewis S. Black, Jr., and A. Gilchrist Sparks, III, *Delaware Corporation Law and Practice* § 43.01 (1993).

**20.** It is to be noted that Delaware statutory law provides for many forms of business enterprise: partnerships pursuant to 6 *Del.C.* §§ 1501–43; limited partnerships pursuant to 6 *Del.C.* § 17–101–1109; limited liability companies pursuant to 6 *Del.C.* §§ 18–101–1106; business trusts pursuant to Title 12, §§ 3801–20. *Compare* the *Close Corporation Supplement* to the *Model Business Corporation Act, especially* Section 20 relating to "Shareholder Agreements."

**21.** *See Rothschild Intern. Corp. v. Liggett Group, Inc.,* Del.Supr., 474 A.2d 133, 136 (1984); *Orzeck v. Englehart,* Del.Supr., 195 A.2d 375, 378

appropriate judicial legislation[22] for this Court to fashion a special judicially-created rule for minority investors when the entity does not fall within those statutes, or when there are no negotiated special provisions in the certificate of incorporation, by-laws, or stockholder agreements. The entire fairness test, correctly applied and articulated, is the proper judicial approach.

## VII. CONCLUSION

We hold that the Court of Chancery correctly determined that the entire fairness test is applicable in reviewing the actions of the defendants in establishing and implementing the ESOP and the key man life insurance program. The Vice Chancellor erred, however, as a matter of law in concluding on this record that the defendants had not carried their burden of showing entire fairness. The trial court erroneously undertook to create a novel theory of corporation law and erroneously failed to set forth and apply articulable standards for determining fairness. Moreover, certain findings of fact by the trial court were not the product of an orderly and deductive reasoning process.

In a case such as this where the business judgment rule is not applicable and the entire fairness test is applicable, the imposition of the latter test is not, alone, outcome-determinative. The doctrine of entire fairness does not lend itself to bright line precision or rigid doctrine. Yet it does not necessarily require equality, it cannot be a matter of total subjectivity on the part of the trial court, and it cannot result in a random pattern of ad hoc determinations which could do violence to the stability of our corporation law.

Accordingly, we REVERSE the judgment of the Court of Chancery and REMAND the matter for proceedings not inconsistent with this opinion.

---

(1963); *Hariton v. Arco Electronics, Inc.,* Del. Supr., 188 A.2d 123 (1963); *Federal United Corp. v. Havender,* Del.Supr., 11 A.2d 331 (1940). *See* David A. Drexler, Lewis S. Black, Jr., and A. Gilchrist Sparks, III, *Delaware Corporation Law and Practice* § 4.02 (1993):

> An important tool to practitioners in the use of the General Corporation Law is the principle of "independent legal significance." The principle holds that the validity of a transaction accomplished pursuant to a specified section or sections of the statute will be tested by the standards applicable to those sections and not by those of other provisions, even though the ultimate economic results could have been achieved through use of procedures authorized by such other provisions and even though use of such other procedures might have created different rights among those affected by the transaction.

22. *Providence & Worcester Co. v. Baker,* 378 A.2d at 124.