John CARSTARPHEN, an
individual, Plaintiff,

v.

Richard MILSNER, an individual and
Does 1 through 10, inclusive,
Defendants.

No. 3:07–CV–542–ECR–RAM.

United States District Court,
D. Nevada,
Reno.

Jan. 5, 2010.

John S. Russo, King & Russo, Ltd., Minden, NV, Patrick O. King, King & Russo, Ltd., Gardnerville, NV, for Plaintiff.

Casey D. Baker, Richard G. Hill, Law Office of Richard G. Hill, Esq., Reno, NV, for Defendants.

### Order

EDWARD C. REED, JR., District Judge.

This case involves claims of breach of fiduciary duty brought by a minority shareholder against a director of a corporation. Plaintiff John Carstarphen alleges that Defendant Richard Milsner, a director of American Medflight, Inc. ("American Medflight"), breached his fiduciary duties in relation to certain transactions involving American Medflight stock, as well as certain business dealings between American Medflight and another company, Reno Flying Service, Inc. ("Reno Flying Service"), of which Mr. Milsner is majority shareholder.

Now before the Court is Defendant's Motion to Dismiss (# 59), which seeks dismissal of this action pursuant to Federal Rule of Civil Procedure 12(b)(7) for failure to join an indispensable party.

The motion is ripe, and we now rule on it.

### I. Background

Plaintiff John Carstarphen has been the owner of a one-third share of American Medflight's issued stock since the company's founding in 1993. (First Am. Compl. ¶ 6(# 4).) In 1993, Defendant Richard

Milsner also owned a one-third share in the company, with the remaining one-third share owned by John Dawson, who is not a party to this lawsuit. (*Id.*) Since 1993, Carstarphen, Milsner, and Dawson have comprised American Medflight's three-person Board of Directors. (*Id.*) Dawson is also the president of American Medflight.[1] (*Id.* ¶ 4.) American Medflight has an Employee Stock Option Plan[2] ("AMF ESOP"), the trustees of which are Milsner and Dawson. (*Id.*)

Milsner is the owner of ninety six and one-quarter percent of Reno Flying Service, which was incorporated in 1991. (*Id.* ¶ 7.) Dawson owns the remaining shares of Reno Flying Service. (*Id.*) In 1998, Dawson's one-third share of American Medflight stock was sold to Reno Flying Service. (*Id.* ¶ 14.) Thus, Milsner controlled two-thirds of American Medflight stock, one-third individually and one-third through his controlling interest in Reno Flying Service. (*Id.*)

In 2005, AMF ESOP purchased both the one-third share of American Medflight owned by Milsner individually and the one-third share of American Medflight owned by Reno Flying Service at a price of $2310 per share. (*Id.* ¶ 16.) Carstarphen was invited to sell his one-third share to AMF ESOP at the same price, but allegedly only on the condition that Carstarphen dismiss certain other litigation he had pending in Nevada state court against Milsner and Dawson, among others. (*Id.* ¶ 15.) Carstarphen declined. (*Id.*)

Plaintiff's first claim for relief, alleging "breach of fiduciary duty and self dealing,"

arises out of these 2005 transactions involving the sale of American Medflight stock to AMF ESOP. At the time of the purchase of Milsner's and Reno Flying Service's shares in American Medflight, AMF ESOP did not have sufficient cash to pay the purchase price immediately. (*Id.*) The balance of the purchase price was financed via a promissory note. (*Id.*) The promissory note appeared on American Medflight's financial statements as a $3.4 million liability. (*Id.* ¶ 17.) With this liability, Carstarphen's shares were allegedly devalued from a market value of $2310 per share to approximately $400 per share, a loss of over $1.5 million in value. (*Id.* ¶ 17.) He argues that Milsner's role in implementing these transactions, which resulted in a loss for Carstarphen and a personal gain for Milsner, amounts to a breach of his fiduciary duties. (*Id.* ¶ 19–20.)

Plaintiff's second claim for relief, also styled as a claim for "breach of fiduciary duty and self dealing," arises out of certain business dealings between American Medflight and Reno Flying Service, which he alleges constitute breaches of Milsner's fiduciary duties. (*Id.* ¶ 23.) Specifically, Carstarphen objects to three categories of actions taken by American Medflight under the control of Milsner: (1) payment of a monthly "consulting fee" to Reno Flying Service, (2) leasing aircraft from Reno Flying Service instead of purchasing aircraft for American Medflight, and (3) using Reno Flying Service for repair of American Medflight airplanes instead of hiring

---

1. It is alleged in the First Amended Complaint that Dawson is the President of American Medflight, but in opposition to the present motion, Carstarphen asserts that Milsner is American Medflight's President. (P.'s Opp. at 1(# 62).) It is possible that one or the other assertion is erroneous, or that the presidency of American Medflight has switched hands since the filing of the First Amended Complaint. We need not resolve this question to rule on the present motion.

2. Plaintiff calls this fund an "Employee Stock Option Plan," while Defendant refers to it as an "Employee Stock Ownership Program." The exact nomenclature is irrelevant for purposes of the present motion. We will refer to it by the consensus acronym.

in-house maintenance personnel. (*Id.*) Carstarphen alleges that each of these actions is taken for the benefit of Reno Flying Service and Milsner as majority shareholder of Reno Flying Service, in breach of Milsner's fiduciary duties to American Medflight and to Carstarphen as a minority shareholder of American Medflight. (*Id.*)

Milsner has denied Carstarphen's allegations and asserted a number of counterclaims.[3] (Answer (# 35).) Milsner's counterclaims consist of the following claims for relief: (1) Intentional Interference with Contractual Relations; (2) Breach of Fiduciary Duty; (3) Intentional Interference with Prospective Economic Advantage; (4) Breach of Covenant of Good Faith and Fair Dealing—Both Contractual and Tortious; and (5) Negligence; and (6) Attorney's Fees.

### II. Motion to Dismiss (# 59)

Milsner's Motion to Dismiss (# 59) is premised on the assertion that Carstarphen's claims are derivative in nature. As such, American Medflight would be a necessary party to the action. Milsner notes that American Medflight cannot be joined in the action without destroying the diversity of the parties, and he argues on that basis that the case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7).

### A. Legal Basis for Permitting a Direct Action

■ A corporation is a necessary party to a derivative action. *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Courts have sometimes recognized exceptions, however, allowing a minority shareholder to file a direct action for relief that would normally be considered derivative. As we explained in a previous case, *Simon v. Mann,* some courts have adopted an exception allowing a minority shareholder in a closely held corporation to file a direct action for wrongs that would normally have to be brought derivatively. 373 F.Supp.2d 1196, 1198 (D.Nev.2005). In addition, it is well established that an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation. *Id.* at 1199. We noted in *Simon* that an Oregon court had found that majority shareholders of a closely held corporation owe a fiduciary duty not only to the corporation but to the minority shareholders, and held that the minority shareholders could bring a direct action for breach of that duty. *Id.* (discussing *Noakes v. Schoenborn,* 116 Or. App. 464, 841 P.2d 682, 686–687 (1992)). Numerous other courts have also recognized such exceptions. *E.g., Sugarman v. Sugarman,* 797 F.2d 3, 7–8 (1st Cir.1986) (applying Massachusetts law); *Kiriakides v. Atlas Food Sys. & Servs.,* 343 S.C. 587, 541 S.E.2d 257, 266–68 (2001); *Barth v. Barth,* 659 N.E.2d 559, 561–63 (Ind.1995); *Derouen v. Murray,* 604 So.2d 1086, 1091 n. 2 (Miss.1992); *Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217, 220–21 (1989); *Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642, 647 (Md.1985); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464, 471 (1969); *Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C.App. 390, 537 S.E.2d 248, 259–60 (2000); *Brown v. Brown,* 323 N.J.Super. 30, 731 A.2d 1212, 1216–17 (1999); *Richards v. Bryan,* 19 Kan.App.2d 950, 879 P.2d 638, 648 (1994); *Evans v. Blesi,* 345 N.W.2d 775, 779–80 (Minn.Ct. App.1984).

---

**3.** Milsner also asserted claims against third parties, who have since been voluntarily dismissed from the case.

In diversity actions, the characterization of an action as derivative or direct is a question of state law. *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir.1987). We predicted in *Simon* that the Nevada Supreme Court would recognize the exceptions described above, if faced with the issue. *Simon,* 373 F.Supp.2d at 1199. We cited *Johnson v. Steel, Inc.,* 100 Nev. 181, 678 P.2d 676, 678–79 (1984), for the proposition that "the Nevada Supreme Court has recognized the particular difficulties shareholders face in closely-held corporations when seeking redress for other shareholders' wrongs." *Simon,* 373 F.Supp.2d at 1199. In *Johnson,* the Nevada Supreme Court allowed shareholders in a closely-held corporation to circumvent the demand requirement of Federal Rule of Civil Procedure 23.1 because oppression by majority shareholders would render the demand futile. *Johnson,* 678 P.2d at 678.

Milsner notes that *Johnson* has since been overruled in part by *Shoen v. SAC Holding Corp.,* 122 Nev. 621, 137 P.3d 1171 (2006). He suggests on the basis of this new authority that Nevada would follow Delaware law with regard to derivative actions, and argues that Delaware law does not recognize the exceptions we discussed in *Simon.* (D.'s Mot. at 6 (# 59).)

We disagree with Milsner's interpretation of *Shoen:* though *Shoen* overruled *Johnson* in part, the proposition for which we cited *Johnson* remains a valid interpretation of Nevada law. *Shoen* did not involve a closely-held corporation, and the plaintiffs in *Shoen* did not seek to bring their claims directly, rather than as a derivative suit, so the exceptions we discussed in *Simon* were not at issue. In *Shoen,* the Nevada Supreme Court cautioned against a "broad reading" of certain language in *Johnson* regarding demand futility, and clarified the pleading requirements regarding demand futility in derivative actions by adopting Delaware's rule on that issue. *Id.* at 1180–81 (holding that "to the extent that *Johnson* suggests that the demand requirement is excused as to the board of directors merely because the shareholder derivative complaint alleges that a majority of the directors participated in wrongful acts, without regard to their impartiality or to the protections of the business judgment rule, it is overruled"). This clarification of pleading requirements in derivative suits does not, however, amount to abandonment of any consideration of the particular difficulties shareholders face in closely-held corporations. Rather, the Nevada Supreme Court sought to balance the interests of shareholders bringing derivative suits with the important policy purposes of the demand requirement and the business judgment rule. *See Shoen,* 137 P.3d at 1180.

Moreover, even if Milsner's argument that Nevada would follow Delaware law here is correct, Milsner's assertion that Delaware law would not permit a defendant in Carstarphen's position to bring a direct action is at least questionable. The Delaware Supreme Court has not adopted exceptions such as those discussed in *Simon,* and has expressed in dicta a distaste for "special judicially-created rule[s]" for minority investors in non-statutory closely held corporations. *Nixon v. Blackwell,* 626 A.2d 1366, 1379–80 (Del.1993). But the holding of *Nixon* did not entirely preclude the possibility of a direct cause of action for minority shareholders in at least some circumstances. *See Clemmer v. Cullinane,* 62 Mass.App.Ct. 904, 815 N.E.2d 651, 652–53 (2004) (citing *Nixon,* 626 A.2d at 1381) ("Despite the sweeping dicta, the *Nixon* decision did not preclude a cause of action for minority shareholder freezeout in close corporations."); *see also Mroz v. Hoaloha Na Eha, Inc.,* 410 F.Supp.2d 919, 934–35 (D.Haw.2005) (discussing Delaware law and citing *Clemmer* and *Nixon* ); *Ri-*

blet Prods. Corp. v. Nagy, 683 A.2d 37, 40 (Del.1996) (noting that majority stockholders "may well owe fiduciary duties" to a minority stockholder under Delaware law); Robert A. Ragazzo, *Toward a Delaware Common Law of Closely Held Corporations*, 77 Wash. U.L.Q. 1099, 1150–51 (1999) (arguing that despite *Nixon* "the death of special shareholder duties in Delaware corporations has been greatly exaggerated"); *but see Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383–84 (7th Cir.1990) (holding that Delaware law does not permit exceptions to usual rules for derivative suits for non-statutory closely held corporations, and questioning the wisdom of such exceptions). Thus, we are unconvinced that Carstarphen could not bring his claims directly, even under Delaware law.

Milsner's arguments citing *Bedore v. Familian*, 122 Nev. 5, 125 P.3d 1168 (2006), are similarly unpersuasive. As in *Shoen*, the plaintiffs in *Bedore* did not seek to bring their claims directly, asserting only derivative claims on behalf of the corporation. As such, the exceptions we discussed in *Simon* were not at issue. Milsner's point that any recovery by Carstarphen in this case would have to reflect the circumstance that Carstarphen owns only one-third of AMF, and therefore he would not be entitled to recover the entire injury to the corporation caused by Milsner's alleged breaches of fiduciary duty, is well taken. Nevertheless, this is not a basis for dismissal of Carstarphen's claims, nor is it probative of whether Carstarphen should be permitted to bring his claims directly, rather than derivatively.

In short, we are unconvinced that *Simon* no longer represents a valid prediction of Nevada law. As such, we turn now to Milsner's alternative argument that, "even if … *Simon* is still viable, the bases for allowing a direct action by a minority shareholder against a director do not apply in this case." (D.'s Mot. at 8 (# 59).)

### B. Application of Exceptions to the Present Case

■ As an initial matter, Milsner suggests that it may be improper to consider American Medflight a closely held corporation. (*See* D.'s Reply at 5(# 69).) This suggestion is without merit. There have never been more than three shareholders of American Medflight, and currently there are only two: Carstarphen and AMF ESOP. Indeed, a corporation could not be more closely held and still give rise to a lawsuit such as the present one: such a corporation would only have a single shareholder, and no dispute regarding alleged breaches of fiduciary duties owed to a minority shareholder could arise. Though Milsner is no longer personally a shareholder of American Medflight, he allegedly controls a two-thirds share of AMF through his positions as trustee of AMF ESOP and as director of American Medflight. *See Simon*, 373 F.Supp.2d at 1200 (noting that cases that allow shareholders to bring direct suits "focus on the nature of the shareholders' relationships and the policy impacts of allowing direct actions").[4] Thus, we are convinced that treating American Medflight as a closely held corporation for the purpose of applying the exceptions to derivative suits is appropriate.

---

4. We must, on a motion to dismiss, accept Carstarphen's allegations that Milsner does control American Medflight and AMF ESOP. We note, however, that Dawson, who is not a party to this suit, is co-trustee of AMF ESOP and the third member of the board of directors of American Medflight. If it should appear, in a different stage of this litigation, that Milsner does not in fact exercise the degree of control alleged by Carstarphen, we may need to reconsider the matters discussed in the present order.

Most courts that have addressed the issue do not invariably treat what would otherwise be derivative actions as direct actions whenever a closely held corporation is involved. *But see Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505, 515–16 (1975). Rather, here, as we did in *Simon,* we must examine the particular circumstances of this case to determine whether we should permit the litigation to proceed as a direct action. In *Simon,* we examined several factors, including whether the plaintiffs had alleged an individual injury; whether there was a danger of subjecting the defendant to multiple lawsuits or unfair recovery; whether there were outside creditors who would have priority for any remedies; and whether relief to the corporation would mostly benefit the alleged wrongdoer in control of the corporation, and thus the plaintiff could not obtain adequate relief through a derivative lawsuit. *Simon,* 373 F.Supp.2d at 1199.

Carstarphen has alleged that Milsner has taken a variety of steps to essentially freeze Carstarphen out of any benefit from his minority share in American Medflight, operating the company in such a way as to benefit Milsner and Reno Flying Service at the expense of American Medflight and Carstarphen. Under *Noakes* and other similar cases, such actions by a majority shareholder could constitute a breach of fiduciary duty, actionable as an individual cause of action. *See id.* at 1200. Though Milsner is no longer directly a shareholder of American Medflight, he allegedly continues to control a two-thirds share in the corporation; as such, the reasoning of *Noakes* applies equally here.

Not all American Medflight shareholders are parties to the present suit. *C.f. Simon,* 373 F.Supp.2d at 1200 (noting that all shareholders except for one, who was attempting to intervene, were already parties to the suit, indicating a "limited danger of multiple lawsuits or unfair recovery"). Theoretically, AMF ESOP could seek to intervene in order to protect its interest in a share of any recovery from Milsner, or bring a separate lawsuit. This seems unlikely, however, given Milsner's alleged control of AMF ESOP. Thus, permitting a direct action here would result in only a limited danger of multiple lawsuits—probably no additional lawsuits, but only a maximum of one.[5] Further, any concern that Carstarphen would receive an unfair windfall at Milsner's expense may be addressed by limiting Carstarphen's direct recovery of injuries to American Medflight to an amount proportionate to Carstarphen's one-third ownership share.

Milsner asserts, without elaboration, that AMF ESOP's interests as a creditor of AMF would be prejudiced by permitting Carstarphen to bring a direct action. It is unclear, however, exactly how AMF ESOP's interests as a creditor of AMF would be prejudiced by a direct action in the circumstances of this case. Courts that have refused to permit direct actions on this basis have normally done so in the context of a corporation that has been dissolved, so that there is only a finite and fixed pool of assets from which creditors could be repaid. *E.g. Maki v. Ziehm Estate,* 55 A.D.2d 454, 391 N.Y.S.2d 705, 707 (1977) (refusing to permit 50% shareholder to claim certain corporate assets of dissolved corporation from the estate of the

---

**5.** Whether Milsner might not breach a fiduciary duty to the beneficiaries of AMF ESOP by failing to cause AMF ESOP to intervene here or independently bring a suit such as Carstarphen's is a separate question. Any potential lawsuits alleging a breach of Milsner's fiduciary duty as trustee of AMF ESOP are not relevant to the present analysis; here, we examine only at the risk of multiple suits arising from Milsner's alleged breaches of his fiduciary duties to the shareholders of American Medflight.

other shareholder through a direct action because to do so would "circumvent the rights of creditors" of the corporation). American Medflight is, so far as the record reveals, a going concern. There is no indication, as there was in *Maki*, that the only means for American Medflight's creditors to be paid is for the company to first recover the allegedly misappropriated funds from Milsner: rather, AMF can simply pay its debts from its operating revenues, as it presumably would in the absence of this lawsuit. As such, it does not appear that there are outside creditors who would have priority for any remedies that Carstarphen might recover from Milsner.

Finally, based on Carstarphen's allegations, it appears that any relief to the corporation that might be recovered through a derivative suit would not in any way benefit Carstarphen. The claims made by Carstarphen boil down to the proposition that Milsner is operating American Medflight in such a way as to funnel any profits, or at least a significant proportion thereof, to Milsner directly or to Reno Flying Services, a company controlled by Milsner. Thus, it appears from the facts alleged that relief to the corporation would mostly benefit the alleged wrongdoer in control of the corporation, and Carstarphen therefore could not obtain adequate relief through a derivative lawsuit.

In short, we find it appropriate to allow Carstarphen to proceed in a direct suit. Because we do not characterize Carstarphen's suit as derivative, American Medflight is not a necessary party to the suit, and its absence as a party is not a basis for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(7).

### IV. Conclusion

Milsner's arguments to the contrary notwithstanding, our predictions in *Simon* regarding certain exceptions permitting plaintiffs to bring direct actions for relief that would normally be considered derivative remain valid predictions of Nevada law. Though the facts of this case differ somewhat from those of *Simon*, it is nevertheless appropriate to permit Carstarphen to proceed in a direct suit. As such, American Medflight is not a necessary party to the suit, and its absence as a party is not a basis for dismissal.

**IT IS, THEREFORE, HEREBY ORDERED THAT** Defendant's Motion to Dismiss (# 59) is **DENIED.**