# CIRCUIT COURT OF BUCKINGHAM COUNTY

Curtis Dixon Colgate et al.

v.

The Disthene Group, Inc.

August 30, 2012

Case No. CL-11-117

By Judge Jane Marum Roush

This matter came on for a bench trial beginning on May 21, 2012, and concluding on June 8, 2012. At the conclusion of the trial, the parties were granted leave to file post-trial briefs. The last brief was filed on August 17, 2012. In addition, at the conclusion of the trial, the defendant moved for summary judgment. The plaintiffs were granted leave to file a brief in opposition to the motion. The court has now fully considered the pleadings, the exhibits, the testimony of witnesses, and the briefs and arguments of counsel. For the reasons stated below, the defendant's motion for summary

judgment will be denied. The plaintiffs' request for judicial dissolution of the defendant will be granted.

## Background

This case began on July 26, 2011, when the plaintiffs Curtis Dixon Colgate ("Curtis"), Sharon Marie Newcomb ("Sharon"), Marion J. Colgate, Sr. ("Boyd"), and Peaceful Valley, Limited Partnership ("Peaceful Valley") filed a complaint seeking the judicial dissolution of the defendant The Disthene Group, Inc. ("Disthene" or the "Defendant") pursuant to Va. Code Ann. § 13.1-747. (Curtis, Sharon, Boyd, and Peaceful Valley will be referred to collectively as the "Plaintiffs.") An earlier iteration of this lawsuit, *Colgate et al. v. The Disthene Group, Inc., et al.*, Case No. CL-10-85, was filed on June 28, 2010, and nonsuited on July 18, 2011.

Disthene is a closely-held Virginia corporation. Many of its shareholders are members of the extended Dixon family. See Attachment A, showing an abbreviated Dixon family tree depicting the principals in this suit. Disthene can trace its origins to 1945 when Gene Dixon, Sr. ("Gene Senior"), and his father, Guy A. Dixon, purchased a kyanite mine in Central Virginia at a bankruptcy sale. The company was originally known as Kyanite Mining Corporation. Its Certificate of Incorporation divided the shares of the company into Class A voting shares and Class B non-voting shares. The Certificate of Incorporation further provided that each class of outstanding shares is "entitled to share equally, share and share alike, in any dividends declared by [the] corporation; in the event of the liquidation of this corporation, both classes of stock shall share equally in any distribution of proceeds from the disposal of the assets of the corporation."

The Plaintiffs own 42% of the outstanding shares of the Defendant. All of the Plaintiffs' shares are Class B, non-voting shares. Gene Dixon, Jr. ("Gene") and his son, Guy Dixon ("Guy"), own all of the Class A voting shares. In addition, Gene and Guy (together with Gene's two other children and family trusts and partnerships) own over 45% of the Class B non-voting shares. With their voting and non-voting shares combined, Gene, Guy, and other entities associated with Gene's side of the family own slightly fewer than 51% of the outstanding shares of Disthene. The other 7% of the outstanding shares are Class B non-voting shares that are owned by eleven individuals who are mostly former employees or the heirs of former employees of Disthene or its predecessor, the old Kyanite Mining Corporation. See Attachment B for a listing of the shareholders of Disthene.

From its modest origins in 1945, Kyanite Mining Corporation grew into a successful and diversified business. Kyanite Mining Corporation is now the world's largest producer of the minerals kyanite and mullite. Kyanite is a "mineral $Al_2SiO_5$ consisting of an aluminum silicate occurring commonly in blue thin-bladed triclinic crystals and crystalline aggregates — called

also *disthene.*" *Webster's Third New International Dictionary* 562 (2002). Kyanite is used as a refractory. Mullite is "a mineral $Al_6Si_2O_{13}$ consisting of a silicate of aluminum that is orthorhombic in form and resistant to corrosion and heat and is found naturally and also made synthetically for use as a refractory." *Id.* at 1485. In addition to the mine, the company owns thousands of acres of land, much of it timberland, in Central Virginia. In 1960, the company acquired the Cavalier Hotel in Virginia Beach. The Cavalier Hotel Corporation was operated as a subsidiary of Kyanite Mining Corporation.

Gene Senior died in 1974. He was survived by his wife Mallie Dixon ("Mallie") and his children Gene and Jeanne Dixon Colgate ("Jeanne"). After Gene Senior's death, Gene and Jeanne inherited stock in Kyanite Mining Corporation from their father. In accordance with Gene Senior's will, Gene received all of his father's Class A voting shares and some of his non-voting shares, while Jeanne received all non-voting shares. In addition, following Gene Senior's death, Mallie had a life interest in a marital trust that held a little over 29,100 shares of Class B stock. Gene was the trustee of the marital trust.

Gene took over the management of Kyanite Mining Corporation in 1974 upon his father's death. The company continued to operate profitably.

Gene's grandfather, Guy A. Dixon, died in 1980. Gene inherited some shares from his grandfather. In 1987, the company redeemed both voting and non-voting shares held by Guy A. Dixon's estate and heirs. After that redemption, Gene held all of the outstanding Class A voting shares.

Jeanne died in 1988 at the age of 47. She was survived by her husband, Boyd, and her children Sharon and Curtis. Under Jeanne's will, Sharon and Curtis received most of Jeanne's Class B stock. Boyd held 564 shares as custodian for Curtis. Sharon and Curtis also became contingent beneficiaries of the marital trust in which Mallie had a life Interest.

In December 2005, Sharon and Curtis brought suit against Gene, alleging improprieties in Gene's handling of the marital trust (the "Trust Litigation"). See *Colgate et al. v. Dixon et al.*, Case No. CH-05-105 (Circuit Court of Buckingham County). In that suit, the plaintiffs alleged that Gene had engaged in self-dealing with the goal of looting the marital trust of all the shares of stock that would otherwise go to Sharon and Curtis on Mallie's death. After the judge in the Trust Litigation ruled from the bench, the parties settled the Trust Litigation. As part of the settlement, Peaceful Valley, which holds Class B shares, was transferred to Sharon and Curtis. The parties to the Trust Litigation executed mutual releases as part of the settlement. Sharon and Curtis did not, however, release Gene from any claims they had against him in his capacity as an officer or director of Disthene.

Also in 2005, Kyanite Mining Corporation was reorganized. Disthene was formed as a holding company with three subsidiaries: Kyanite Mining

Corporation ("Kyanite"), Blue Rock Resources, L.L.C. ("Blue Rock"), and the Cavalier Hotel Corporation. Kyanite operates Disthene's mining business, Blue Rock holds the land (presently 28,164 acres), and the Cavalier Hotel Corporation continues to operate the hotel.

Since the reorganization, Gene has been the president and chairman of the board of directors of Disthene. Gene is also a director of Kyanite. Guy is the president and a director of Kyanite, a director of Disthene, and a manager of Blue Rock. Until 2009, Gene's daughter, Erica Vail Dixon ("Vail") was the president and a manager of Blue Rock. After leaving the presidency, Vail was in charge of "special projects" for Blue Rock until March 2012. Vail remains a manager of Blue Rock. Gene's wife, Barbara Dixon ("Barbara"), and son, Arch Dixon ("Arch"), are directors of the Cavalier Hotel Corporation. See Attachment C for a list of the officers and directors of Disthene, Kyanite, and the Cavalier Hotel Corporation, as well as the officers and managers of Blue Rock. .

The Plaintiffs allege that Disthene should be dissolved because Gene and Guy have engaged in a pattern of oppressive and fraudulent conduct designed to disadvantage the minority shareholders and consolidate all of Disthene's outstanding shares on Gene's side of the family. Further, according to the Plaintiffs, Gene and Guy have misapplied and wasted corporate assets. The allegations of oppressive, fraudulent, and wasteful conduct include:

Gene's stated goals are to maintain voting control of Disthene in himself and Guy, to consolidate ownership of all of the Class B shares in the smallest number of people (preferably on his side of the family), and to keep the per share value of the stock as low as possible;

Many of Gene's actions are driven by his desire to keep the share value as low as possible in order to minimize the estate taxes that will be due upon Gene's death and the deaths of other shareholders on his side of the family;

After Sharon and Curtis instituted the Trust Litigation, Gene retaliated by drastically cutting the dividends paid to shareholders in order to squeeze them out or deprive them of the funds needed to prosecute the Trust Litigation;

At the same time that the dividends were sharply reduced, Gene authorized exorbitant salaries and bonuses to himself and Guy;

In the past, Gene has suppressed or eliminated dividends in order to squeeze out minority shareholders;

Disthene has intentionally misrepresented the value of its stock when redeeming its shares from minority shareholders;

At the behest of Gene, Disthene undertook a program to purchase and/or pay the substantial premiums on life insurance policies on the lives of Gene, Barbara, Guy, and Mallie, all for the benefit of Gene's children and grandchildren;

Gene and his family have used the company's assets for their own use without compensating Disthene;

Disthene intentionally fails to operate Blue Rock and the Cavalier Hotel as profitable businesses;

Blue Rock and the Cavalier Hotel serve to siphon corporate funds to Dixon family members who are compensated for their services as officers, directors, and managers despite minimal qualifications for their positions;

Gene and Guy have resisted providing any meaningful corporate records to Sharon and Curtis.

Disthene generally denies the Plaintiffs' claims and asserts that the claims are barred by the business judgment rule. Va. Code § 13.1-690. In its Answer, Disthene notes that "[m]uch of the Complaint alleges actions that squarely fall within the Business Judgment Rule, for example . . . decisions as to the setting of dividends, the assets to be held, business strategy, restructuring Disthene and its subsidiaries, the provision of information to shareholders in addition to disclosures required by statute . . . the election [by] Disthene of directors and managers of subsidiaries, the accounting for miscellaneous interested party transactions, the preparation and presentation of information in financial statements, and offers to redeem shares, are all subject to the Business Judgment Rule." See Answer at p. 8.

*Judicial Dissolution*

The Plaintiffs seek dissolution of Disthene under Va. Code § 13.1-747. That statute provides, in pertinent part, that:

> The circuit court in any city or county . . . may dissolve a corporation:
> 1. In a proceeding by a shareholder of a corporation that is not a public corporation if it is established that. . . .
> b. The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent; or. . . .
> d. The corporate assets are being misapplied or wasted.
> . . .

Va. Code §§ 13.1-747(A)(1)(b) and (d). Va. Code § 13.1-749(A) provides that, if, "after a hearing the court determines that one or more grounds for judicial dissolution described in § 13.1-747 exist, it may enter a decree directing that the corporation shall be dissolved." The statute is clearly permissive. Judicial dissolution is not mandatory upon a finding that oppression, fraud, or waste has occurred.

The judicial dissolution statute is remedial in nature and should be liberally construed. It provides an additional remedy for the protection of

stockholders, particularly minority stockholders. *Baylor v. Beverly Book Co.*, 216 Va. 22, 24, 216 S.E.2d 18 (1975) (applying former Va. Code § 13.1-94); *Cattano v. Bragg*, 283 Va. 638, 649, 727 S.E.2d 625 (2012).

In *White v. Perkins*, 213 Va. 129, 189 S.E.2d 315 (1972), the Supreme Court of Virginia opined that:

> [T]he word "oppressive," as used in the statute does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of mismanagement, or misapplication of assets, does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent."

*Id.* at 134 (internal quotations and citations omitted). The Court held that "oppressive" means "a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely" and "a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." *Id.* (internal citations omitted). See also *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990).

The case of *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990), involves factual allegations similar to those asserted by the Plaintiffs in this case. In *Giannotti*, minority stockholders in a close corporation sought judicial dissolution of the corporation. They alleged that the corporate officers, directors, and majority shareholders had acted to oppress minority shareholders and misapply and waste corporate assets. The alleged oppressive conduct consisted of excessive compensation to the officers and directors, improper "related party transactions," and inadequate dividends paid to stockholders. The Supreme Court held that, "[w]here, as here, oppressive conduct and misapplication or waste of corporate asset are charged, the plaintiff's burden is to prove the allegations by a preponderance of the evidence." *Id.* at 23. When, however, transactions occur between a corporate officer and the corporation to whom fiduciary duties are owed, "the burden of proof lies upon the persons who fill the position of trust and confidence to show that the transaction has been fair." *Id.* at 24. "This burden-of-proof principle is an exception to the business judgment rule which limits the power of courts in reviewing the internal management of corporate affairs." *Id.* Further, when the plaintiff shows that a director had an interest in a transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation. *Id.*

Courts generally should be "reluctant to order liquidation of a functioning corporation at the instance of minority stockholders." *Id.* at 28. *Brennan v.*

*Rollman,* 151 Va. 715, 731, 145 S.E. 260 (1928). Nonetheless, the General Assembly has cloaked courts with "full power" to liquidate in a proper case where oppressive conduct has been established. The remedy of dissolution specified by the legislature, while discretionary, is "exclusive," and does not permit the trial court to fashion other, apparently equitable remedies. *White v. Perkins,* 213 Va. 129, 189 S.E.2d 315 (1972) (chancellor erred in awarding remedies other than dissolution).

### The Business Judgment Rule

The Defendant alleges that the Plaintiffs' claims are defeated by the business judgment rule. The statutory business judgment rule, on which the Defendant relies, is found in Va. Code § 13.1-690. That statute provides:

> A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.
>
> B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:
>
> 1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;
>
> 2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or
>
> 3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.
>
> C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.
>
> D. A person alleging a violation of this section has the burden of proving the violation.

Va. Code § 13.1-690.

The statutory business judgment rule does not abrogate the common law duties of a director. *Willard v. Moneta Building Supply, Inc.,* 258 Va. 140, 151, 515 S.E.2d 277 (1999). A director's duties, such as the duty of care and the duty of loyalty, are found in the common law. The statute sets the standard by which a director is to discharge those duties. If a director acts

in accordance with the statute, Va. Code § 13.1-690(C) provides a "safe harbor" that shields the director from liability for actions taken as a director or for the failure to take action. *Id*.

"[T]he statutory standard is a liability standard and, accordingly, might best be looked at as a minimum expectation rather than as an aspirational standard." Allen C. Goolsby, *Goolsby on Virginia Corporations*, 165 (4th ed. 2011). Mr. Goolsby observes that the statutory standard overlaps, but does not repeal or codify, the common law business judgment rule and the related business judgment doctrine. *Id*. at 170. See also Joseph Hinsey, IV, "Business Judgment and the American Law Institute's Corporate Governance Project: the Rule, the Doctrine, and the Reality," 52 Geo. Wash. L. Rev. 609 (1984).

The common law business judgment rule acts as a shield to protect directors from individual liability for decisions made on behalf of the corporation. "Under this rule, directors are presumed to have acted properly and in good faith in the exercise of their business judgment . . . and are called to account for their actions only when they are shown to have engaged in self-dealing or fraud, or have acted in bad faith." *Giannotti, supra*, 239 Va. at 24. Mr. Hinsey notes that the essential elements of the common law business judgment rule are (1) the absence of personal interest or self-dealing, (2) an informed decision, which reflects a reasonable effort (subject to permitted reliance upon the advice of others) to become familiar with the relevant and available facts as well as an actual decision, (3) a reasonable belief that the decision serves the interests of the corporation, and (4) good faith. The presence of improper motives forecloses a finding that the action was taken in good faith. *Hinsey, supra*, at 610.

While the business judgment rule protects the directors from personal liability, the business judgment doctrine protects the decision itself. "The doctrine recognizes the legitimacy of the board as decision maker and the substantial judicial deference to be accorded thereto." *Hinsey, supra*, at 611-12. See, e.g., *Gottlieb v. Economy Stores, Inc.*, 199 Va. 848, 102 S.E.2d 345 (1958) ("It is generally held that the power of courts in reviewing the internal management or policies of corporations is limited in scope and confined to cases of fraud, bad faith, breach of trust, gross mismanagement, or *ultra vires* acts.").

The scope of Va. Code § 13.1-690 is not restricted to the issue of a director's liability for corporate actions or inactions. "Because the statute defines the duties of the directors, a claimed breach of those duties will serve as a basis for seeking to enjoin or invalidate action by the corporation pursuant to the challenged board decision." Goolsby, *supra*, at 172.

It is important to note that Va. Code § 13.1-690 applies only to the discharge of duties as a director of a corporation. It does not by its terms apply to officers. *Simmons v. Miller*, 261 Va. 561, 576, n. 3, 544 S.E.2d 666 (2001). Goolsby, *supra*, at 168, n. 87.

Further, Va. Code § 13.1-690 offers no protection to a corporate director who has not exercised his or her business judgment on behalf of the corporation. If the director has acted on his or her own account, and contrary to the interests of the corporation, the business judgment rule does not apply. *Simmons, supra,* at 577.

Finally, the business judgment rule and the business judgment doctrine apply only when the directors actually exercise their good faith business judgment. Thus, in *Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112 (4th Cir. 1989), rev'd on other grounds, 501 U.S. 1083, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991), the directors were not entitled to the protections of Va. Code § 13.1-690 where they did not engage in an informed decision-making process, exercised no independent judgment, and "merely rubberstamped everything placed before them."

## Discussion

During the course of the trial, which lasted fourteen trial days, over thirty witnesses testified, and approximately 1,420 exhibits were introduced into evidence. Of course, throughout the course of the trial, the court observed the witnesses and their demeanors and made determinations as to their credibility. To the extent the court's recitation of the facts below differs from a party's position on those facts, the court's recitation will constitute the court's findings of disputed fact.

In addition, the parties have submitted well over 500 pages of post-trial briefs. The court will not attempt here to restate in detail all of the evidence adduced at trial. The parties deserve a prompt resolution of their dispute which such an exercise would preclude. The court concludes that the Plaintiffs have carried their burden to prove to the court's satisfaction that Disthene should be judicially dissolved under Va. Code § 13.1-747 because of long-standing and ongoing oppression of minority shareholders and waste and misapplication of corporate assets. Further, the court concludes that the transactions complained of are not protected by the business judgment doctrine because Disthene's board of directors did not act as a board and make informed decisions. To the extent it had any involvement in the decisions, the board merely bent to Gene's ironhanded will and rubberstamped his decisions. Gene and Guy did not exercise their good faith business judgments in their dealings with the Plaintiffs and other minority shareholders. They were motivated not by the best interests of the corporation, but by their personal best interests. The court has determined that judicial dissolution is the appropriate remedy in that the corporation is controlled by a domineering shareholder who is unlikely ever to treat the minority shareholders fairly.

The dynamics of the management of Disthene is strikingly similar to the observations of Professors O'Neal and Thompson:

In many instances a shareholder who also holds a directorship and the chief executive position in a corporation runs the business in a one-person, autocratic manner that is not appropriate in an incorporated enterprise that has other shareholders. The CEO may disregard views of co-directors and completely ignore customary corporate procedures and paraphernalia. Such high-handed practices lead to conflicts with other strong-minded personalities among the shareholders and set the stage for a squeeze-play.

Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and L.L.C. Members*, § 2:7 (rev. 2d ed. 2012). Professors O'Neal and Thompson define "squeeze-out" and "partial squeeze-out" as follows:

By the term "squeeze-out" is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants. . . . [A] "partial squeeze-[out]" . . . is [an] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled. A squeeze-out normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose.

O'Neal and Thompson, *supra*, at § 1:1.

Gene's long-stated goals are three-fold: (i) to maintain all the Class A voting shares with himself and Guy; (ii) to consolidate the ownership of the Class B shares in as few people as possible, preferably on his side of the family; and, (iii) to keep the per share value of the stock as low as possible. See, e.g., P's Ex. # 27. Gene strives to keep the per share value as low as possible to minimize estate taxes that will be due on the death of a major shareholder, such as himself.

There is nothing improper about Gene's desire to maintain the voting shares with himself and Guy. In *Glass v. Glass*, 228 Va. 39, 53-54, 321 S.E.2d 69 (1984), the Supreme Court held that majority stockholders have the right to retain their stock, to control management of the corporation, and to act together to accomplish their legitimate aims. Where Gene visibly departs from the standards of fair dealing, however, is in the steps he has taken to effectuate his desires to consolidate the ownership of the Class B

shares on his side of the family and to keep the per share value of the stock as low as possible.

The court will next review some of the Plaintiffs' specific allegations of oppression, waste, and misapplication of assets.

### Suppression of Dividends

Professors O'Neal and Thompson note that "[o]ne of the most commonly used squeeze techniques is to withhold dividends." O'Neal and Thompson, *supra*, at § 1:3. Indeed, they term it a "classic squeeze-out technique." *Id.* at § 3:4. "By declaring no dividends at all or keeping dividend payments low, majority shareholders may force a minority shareholder to sell their minority interest at considerably less than actual value." *Id.*

The evidence is clear that Gene has used his power to control dividends to retaliate against Sharon and Curtis for having instituted the Trust Litigation in December 2005. The settlement of the Trust Litigation resulted in Peaceful Valley (and its over 11,600 Class B shares) being transferred from Gene's side of the family to Sharon and Curtis. Prior to 2006, Disthene consistently paid dividends in the range of $4 to $6 per quarter. In the first quarter after the Trust Litigation was instituted, dividends fell to a near all-time low of 85 cents. Dividends remained at that level for thirteen consecutive quarters, until 2010. The dividends began to be restored to previous levels only when Sharon and Curtis served their derivative demands on Disthene and its subsidiaries. The Plaintiffs have filed a derivative action against the Defendant and others. See *Colgate et al. v. The Disthene Group, Inc., et al.*, Case No. CL-10-158 (Circuit Court of Buckingham County).

Sharon and Curtis were not the only shareholders harmed by Gene's retaliatory slashing of the dividends. Cheryl Kay, who owns 2,458 shares, testified that she is a granddaughter of Guy A. Dixon (and thus Gene's first cousin). Her late father, Carroll Kay, worked for Disthene's predecessor, the old Kyanite Mining Corporation, for over fifty years. The sharp drop in the level of dividends that she had come to expect forced her to sell her condominium in Nags Head, North Carolina. Similarly, Cheryl Kay's stepmother, Lorene Kay, testified that she was negatively impacted when the dividends on her 171 shares were reduced.

Gene and Guy deny that the cut in the dividends in 2006 had anything to do with the Trust Litigation, or that the gradual increase in the dividends beginning in 2010 had anything to do with the derivative demands. Guy scoffed at the suggestion that there was any nexus between the status of the litigation and the level of dividends. He testified that Sharon and Curtis "ascribe way too much importance to [their affect] on our decision making process." Gene and Guy instead attribute the reduction in dividends to Disthene's need to conserve cash to fund its aggressive capital improvement

program. Elizabeth Steger, a director of Disthene, testified that she did not know why dividends were cut to 85 cents.

Gene's and Guy's explanation of the 2006 dividend cut is belied, however, by the fact that, at the same time that they claim the company was cash-strapped, Gene awarded himself and Guy enormous pay raises and even larger bonuses. Indeed, the amount by which dividends were reduced was nearly equal to the amount by which Gene's and Guy's total cash compensation increased. See P's Ex. ## 13, 14, 15, 17, and 19. Dividends were reduced from the first quarter of 2006 through the first quarter of 2010 in the aggregate amount of $954,798. During the same period, Gene's and Guy's total cash compensation increased by $1,041,600.

The credibility of Gene's and Guy's explanation of why Disthene cut dividends is called into question by the varying statements they have made as to the financial status of the company at that time. Gene testified he doubled his bonus in 2006 because he thought the company was "on an upward path." Yet he said he reduced dividends at the same time because "[o]ur business was off by more than half. Our profits disappeared." Guy said that the company started to struggle in 2004, but, by 2005 "the financials started to turn around." Guy also testified that the dividends went to 85 cents in 2006 because "we lost $1,000,000 the year before."

The court found credible the opinion of Maurice Whelan, who testified as an expert forensic accountant for the Plaintiffs. He concluded that there was no financial reason to reduce the dividends in March 2006. At that time, there was more than enough working capital to keep dividends at the 2001 level, even when taking into account the high executive compensation and the increased capital expenditures.

Professors O'Neal and Thompson observe that "majority shareholders usually immunize themselves from the adverse effects of a dividend squeeze by increasing their own salaries and benefits to high levels." O'Neal and Thompson, *supra*, at § 3:4. That appears to be what occurred in this case.

Even prior to 2006, Gene had used the technique of slashing dividends to force minority shareholders to sell their stock to Disthene at rock bottom prices. In the late 1980s, after Gene's grandfather died, approximately 21,000 shares of stock were owned by the estate of Guy A. Dixon and the heirs of Guy A. Dixon. Gene's two uncles were the executors of his grandfather's estate. The uncles could not agree between themselves about selling the estate's shares back to the company. Gene wanted to reduce the number of shareholders with whom the company had to deal and to consolidate the shares into the fewest number of people possible. Gene stopped paying any dividends at all, forcing the estate and heirs to sell the stock at the price of $160, far below the then-book value of $387. See P's Ex. # 949. The court found not credible Gene's testimony that it was "way beyond his ability to recall" why he reduced the dividends to zero in 1987. The court also found not credible Gene's statement that he had

no dispute with the estate of his grandfather, Guy A. Dixon. See P's Ex. # 946. Immediately after Gene settled with his grandfather's estate, dividends were increased to $5 per share.

In *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990), the Supreme Court of Virginia affirmed the decision of the trial court to dissolve a corporation on the basis of oppression and misuse of corporate assets where, among other things, the corporation "fail[ed] to pay adequate dividends" at the same time the corporate officers and directors awarded themselves excessive compensation.

Gene's decision to cut dividends in 2006 is not entitled to the protection of the business judgment doctrine. It was not a decision that was made by the board of Disthene after a deliberative process. It was Gene's individual decision. Gene was not exercising his good faith judgment of what was in the best interests of the company. He was acting in bad faith, out of his personal motive to retaliate against Sharon and Curtis for having brought the Trust Litigation. Presumably, his intention was to disadvantage Sharon and Curtis to the point that they would sell out their shares and/or be unable financially to maintain the Trust Litigation.

*Unfairness to Shareholders in Share Redemptions*

Professors O'Neal and Thompson note that:

> A squeeze-out is often effected by a director or "inside" shareholder purchasing the shares of a minority holder without disclosing information that bears on the value of the shares. . . . A similar problem is raised when the majority shareholders in a close corporation cause the corporation to buy a minority interest and do not reveal to the selling shareholder information affecting the value of the shares. Actually, the majority shareholders are purchasing the shares for themselves, as the benefit to them is only one step removed.

O'Neal and Thompson, *supra*, at § 3:18. The "acquisition by a close corporation of a substantial part of its shares at a low price is an indirect way of benefitting the remaining shareholders." *Id.* at § 3:18, n. 3.

Corporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings. *Remora Investments v. Orr*, 277 Va. 316, 673 S.E.2d 845 (2009); *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69 (1984); *Adelman v. Conotti Corp.*, 215 Va. 782, 213 S.E.2d 774 (1975). In an effort to reduce the number of shareholders and consolidate the outstanding Class B shares on Gene's side of the family, Gene and Guy were not fair, honest, and candid with shareholders who wanted to sell their shares back to the company.

In 2008, Guy knew that a valuation of the company by James Brockardt of BCG Valuations was underway (the "Brockardt Valuation"). The Brockardt Valuation was undertaken to value the shares of Disthene for the purpose of paying gift tax on the transfer of Peaceful Valley to Sharon and Curtis as part of the settlement of the Trust Litigation. He had received a preliminary estimate that the Brockardt Valuation would result in a valuation of Disthene stock at over $400 per share.

Also in 2008, Harvey Bryant and his brother inherited 166 shares of stock from their mother, Emilie Harvey Bryant. Mrs. Bryant was the sister of Terrell Harvey Dunnavant, who had worked for the company for over sixty years, since even before Guy A. Dixon and Gene Senior purchased the company in 1945. Mr. Bryant asked Guy how much the stock was worth as of the date of his mother's death. He told Guy that he was interested in selling the stock to the company. Guy initially offered to buy the stock at $175 per share. Mr. Bryant told Guy that he did not want to short change himself. Guy told Mr. Bryant that the stock was worth less than $100 a share. Guy disclosed that a valuation of the company was underway, but the valuation would be a "guesstimate" and "highly theoretical." Guy misled Mr. Bryant into believing that Disthene was doing him a favor, in light of the high regard that the company had for his late aunt, by redeeming the stock at the "above market" price of $200 per share. See P's Ex. # 266. Mr. Bryant agreed to sell the shares for $200 per share, feeling that he had no other choice. At the time, the shares had a book value of $614.33. See P's Ex. # 949.

Mr. Bryant testified that he and his brother wanted to use the proceeds of the redemption for their retirements. If the shares were redeemed at the Brockardt Valuation's $400 estimate known to Guy at the time, the Bryant brothers would have received $72,503.82. If they had been paid the book value, they would have received $101,978.78. As it was, the brother's received $33,200 for their shares.

Guy promptly notified Mr. Brockardt of the company's purchase of Emilie Harvey Bryant's shares for $200 per share.

The Brockardt Valuation was finalized in 2009. It valued the Class B shares at $436.77 and the Class A shares at $459.76. At the time, Guy said that the valuation was "spot on."

In fact, Guy knew that the Brockardt Valuation understated the value of the shares. Guy took steps to depress Mr. Brockardt's ultimate conclusion as to the value of the stock. Among other things, Guy stressed to Mr. Brockardt that Kyanite had obtained a report (the "Wiley Wilson Report") that estimated that the company had a potential liability of $38.2 million for future reclamation costs when the mine is eventually closed. In truth, Guy considered the $38.2 million number to be "shocking," "incorrect," and "not based in reality." Both Guy and Gene thought that the conclusion of the Wiley Wilson report was "way too high." Yet Guy told Mr. Brockardt

that the $38.2 million estimate was a conservative number. He advised Mr. Brockardt that Kyanite had a value of negative $23 million when the reclamation costs were taken into account. P's Ex. # 212. Additionally, Guy falsely told Mr. Brockardt that the company had never redeemed shares for anything approaching book value. P's Ex. # 217. Mr. Brockardt considered and commented on both of those misrepresentations in arriving at his final values.

In 2010, Linda Berry contacted the company to determine the value of its shares. Ms. Berry was the executor of the estate of her aunt, Ida B. Harvey, who died in December 2009. Ms. Harvey, who was Ms. Dunnavant's sister, had herself worked for the company for many years. Guy initiated discussions with Ms. Berry about whether the estate wanted to sell its shares to the company. P's Ex. # 274. Guy told Ms. Berry that Disthene's shares were last traded in 2008 for $200 per share and that the shares had declined in value since then due to the poor economy. After Ms. Berry had accepted the offer to sell the estate's shares for $200 per share, Guy told Ms. Berry about the Brockardt Valuation, but again dismissed it as "highly theoretical." P's Ex. # 276. Guy wrote Ms. Berry that, "out of admiration for [Ida B. Harvey] and her family and out of respect for her and her family's contribution to the company over the years, the company would be willing to honor that 2008 price of $200." P's Ex. # 274. Ms. Berry sold the estate's stock to Disthene for $200 per share. She testified that "I knew my aunts would have wanted me to accept the Dixons' offer. They held them in high regard." At the time, the shares had a book value of $623.13. See P's Ex. # 949.

If the 166 shares owned by the Estate of Ida Harvey had been sold for the amount determined by the Brockardt Valuation, the estate would have received $72,503.82. If the shares were sold for book value, the estate would have received $103,439.58. As it was, the estate received $33,200.

When Gene was asked why he consistently redeems shares from minority shareholders at less than fair value, he testified that it was "[b]ecause the next estate may have an estate tax that is massive, and you have just set them up, you know, for bankruptcy." Gene conceded that this concern applied to his own future estate. Gene testified that the company was telling redeeming shareholders that the company was worth less than it was in the 1980s in order to help them out with their estate taxes. Gene was unaware that Harvey Bryant and his brother had no estate tax concerns.

In negotiating the share redemptions with Mr. Harvey and Ms. Berry, Guy's goals were the same as Gene's, to minimize the number of Class B shareholders and to keep the share price as low as possible to justify to the Internal Revenue Service (IRS) a low value for estate tax purposes.

The Defendant argues that it had no duty to disclose the true value of the company to shareholders wanting to sell their stock to the company. A stock redemption, claims Disthene, is an arm's length transaction and the

company is free to drive as hard a bargain as it chooses. In support of that proposition, the Defendant relies on *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69 (1984). That case involved a suit by former minority shareholders of a corporation against the majority shareholders, alleging a business conspiracy because the majority shareholders interfered with the plaintiffs' sale of their stock to a third party, refused to purchase their shares for a fair price, and banded together to sell their majority stake at a premium. In affirming the trial court's judgment in favor of the defendant majority shareholders, the Supreme Court held:

> Defendants could lawfully offer to buy plaintiff's stock, in arms' length negotiations, at any price, regardless of appraisals of other offers. Nor was such an attempt to purchase improper even if it was motivated by a desire to eliminate dissident stockholders and to establish a low valuation of an estate's stock in the closely held Corporation.

*Id.* at 49. The Defendant also relies on *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993), in which the Supreme Court of Delaware held that "[i]t is well established in our jurisprudence that stockholders need not always be treated equally for all purposes." *Id.* at 1376.

*Glass* and *Nixon* do not support Disthene's position that minority, non-voting shareholders in a close corporation have no right to be treated fairly in a stock redemption. *Glass* did not involve a corporation's redemption of its own stock. It was a direct suit by former minority shareholders of a corporation against other shareholders, directors, and officers for their individual actions relating to the sale of the majority shareholder's stock. Similarly, *Nixon* has no applicability to this case because, as the Supreme Court of Delaware noted, "[t]he only issue before this Court is the ruling by the trial court . . . that the defendants breached their fiduciary duties by failing to provide a parity of liquidity" to Class B non-voting shares. *Nixon, supra*, at 1374.

A 1946 law review article noted the tension between a corporate officer's desire to drive a hard bargain on behalf of the corporation when negotiating a stock redemption, on the one hand, and his or her duty to be fair to the selling shareholder, on the other:

> [There is] the possibility that corporate managers will be subjected to two conflicting duties if they undertake to negotiate a purchase by the corporation of its own securities. . . . If principles of efficient management require them to purchase for the corporation in some instances, it would seem that they might be obligated as fiduciaries of the company to buy as cheaply as possible, *without resorting to such*

*misrepresentation and half-truths as would furnish the basis of a common-law action for deceit.* Consequently, it may be inconsistent in some situations to place them under a duty to the seller to make full disclosure of matters that might stiffen the price. . . .

There is some common-law authority, on the other hand, for imposing a duty of disclosure on directors and officers when negotiating a purchase for the corporation of its own securities. *The cases where liability was inflicted, however, involved transactions obviously utilized by corporate managers as devices for increasing the value of their own substantial holdings.* In such a situation, the causal connection between the purchase and profit to the managers is only one step more indirect than if they had bought for their own accounts. Consequently, there seems no reason to relieve them of a duty of disclosure to the seller because of a supposed conflict with an obligation to the company to buy at the lowest possible price.

Note, "SEC Action Against Fraudulent Purchasers of Securities," 59 Harv. L. Rev. 769, 775-77 (1946) (internal footnotes omitted, emphasis added).

Professor Lyman Johnson, an expert in corporate governance matters, testified on behalf of the Plaintiffs. He opined that a corporation redeeming its shares must be forthcoming with selling shareholders who ask for information. Professor Johnson added "[e]ven if they do not ask, you have to make full disclosure. This is a securities transaction."

The court concludes that Disthene was not free to engage in "misrepresentations and half-truths" as to the true value of the company when redeeming its stock from minority shareholders. Both Mr. Bryant and Ms. Berry asked for Disthene's opinion of the value of the stock. In response, Guy falsely told both Mr. Bryant and Ms. Berry that the $200 per share price was "above market" and was only being offered because of the deep regard the company had for Ms. Dunnavant and Ms. Harvey.

Disthene's misrepresentations made in the course of redeeming the stock of the Bryant and Harvey estates amounted to oppression because they constituted "a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely" and "a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." *White v. Perkins*, 213 Va. 129, 134, 189 S.E.2d 315 (1972). See also *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990).

Furthermore, corporate directors are not entitled to the benefit of the business judgment rule when their decisions are not made to further their good faith belief of what is in the best interests of the company, but instead

are made to further their personal estate plans. *Flippo v. CSC Associates,* 262 Va. 48, 547 S.E.2d 216 (2001).

### The Attempted Squeeze Out of Jeanne's Estate

Gene also tried unsuccessfully to acquire all of his sister Jeanne's shares upon her death in 1988. When Jeanne died, her shares were left to her children, Sharon and Curtis. Her husband Boyd also received some shares as custodian for Curtis, who was only nine years old at the time. Gene had promised Jeanne on her deathbed that he would take care of Sharon and Curtis and treat them fairly. Shortly after Jeanne's death, however, for reasons that were never made clear to the court, he reneged on that promise. For example, the company had a $2,000,000 keyman life insurance policy covering Jeanne's life, although Jeanne was not an officer, director, or employee of the company. The ostensible business purpose of the policy was to enable the company to purchase enough of Jeanne's shares to provide liquidity to her estate such that her estate could pay the estate taxes on the 20% to 25% of the company that Jeanne owned at her death. Gene refused to apply any of the proceeds of the policy for its stated purpose unless the estate agreed to sell him all of Jeanne's shares for $160 per share. At the time, the book value of the company was $387.33. See P's Ex. # 949.

Gene was extremely reluctant to provide any information on the value of the company to Jeanne's executrix, then-Virginia Attorney General Mary Sue Terry, or the executrix's attorney George Albright. They had to bring suit against the company to exercise the estate's shareholder inspection rights in order to obtain basic information to enable them to file an estate tax return.

Gene insisted that Ms. Terry and Mr. Albright should use the $160 per share value that the IRS had accepted for his grandfather's estate tax purposes in 1988. Mr. Albright testified that he could not discern how Gene arrived at the $160 figure. Book value was over $380. In Mr. Albright's experience, the book value of an operating business is usually well below fair market value. In addition, the redemption and retirement of 21,000 shares of Guy A. Dixon's estate in 1987 would have greatly reduced the number of outstanding shares and thus greatly increased the value of the shares that remained outstanding.

Gene testified that "[c]oming up with a value for the IRS is in some ways a game." He was concerned that Ms. Terry and her advisors "were trying to get a value that would have caused massive estate taxes and [brought] the estate down." He thought that Ms. Terry would cause a high per share value to be established with the IRS that would increase the future estate taxes of other shareholders, including him.

The estate tax return was eventually filed. The estate managed to pay the estate taxes with its own funds. Jeanne's shares remained in the hands

of her heirs, solidifying the dichotomy that exists today between "Gene's side" of the family and the "Colgate side" of the family.

### Excessive Executive Compensation

As mentioned above, at the same time that dividends were sharply reduced, executive compensation to Gene and Guy sharply increased.

Once again, Professors O'Neal and Thompson identify this practice as a form of shareholder oppression:

> In another commonly-used squeeze-out technique, majority shareholders siphon off corporate wealth by causing a corporation to pay its majority shareholders, and perhaps members of their immediate family or other relatives, excessively high compensation for services rendered as directors, officers, or employees. . . .
>
> Instead of treating all of the stock alike, and distributing the profits fairly and proportionately by way of dividends, the majority first elect themselves directors, then, as directors, elect themselves officers, and then distribute among themselves a substantial part of the profits in the way of excessive salaries, additional compensation, and other devices.

O'Neal and Thompson, *supra*, at § 3:7.

In *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990), the Supreme Court of Virginia cited excessive executive compensation as one basis of its finding of oppression of minority shareholders that led to the judicial dissolution of the subject company. The Court noted that:

> Courts are hesitant to question the reasonableness of a corporate officer's compensation when it is set by a disinterested board. However, as in this case, where the directors of a close corporation elect themselves as officers and set their own salaries and they are all accused of combining to fix excessive salaries for each other, it is impossible to have a "disinterested board."

*Id.* at 24 (internal citation omitted). Further, when a plaintiff "demonstrates that a director had an interest in the transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation."

The factors to be considered in judging reasonableness of the compensation include qualifications of the employee, the nature, extent, and scope of the employee's work, the type of services rendered, the difficulties involved in

discharging responsibilities, success of the business, comparison between salary paid to the corporation's net income, comparison of compensation paid to comparable officers in other companies, and similar relevant factors. *Id*. at 25.

In this case, the compensation of Gene and Guy is not set by the board of directors. Gene and Guy generally discuss what compensation should be for the coming year. Gene is the "decider" and he makes the final decision on what the compensation will be based on his "experience and intuition."

Both the Plaintiffs and the Defendant presented expert testimony on the subject of whether Gene's and Guy's compensation has been excessive when compared to the compensation paid to comparable officers in other companies. See Attachment D for a chart showing Disthene's Executive Compensation from 1997 to 2011.

Peter W. Kennedy was the Plaintiffs' expert on executive compensation. He testified that the purposes of executive compensation are to attract, retain, motivate, and reward executives. He analyzed Gene's total cash compensation from 2001 to 2011 and Guy's total cash compensation from 2006 to 2011. He principally relied on the Economic Research Institute (ERI) Executive Compensation Assessor data base. He concluded that the compensation of both Gene and Guy greatly exceeds the median compensation for mining executives in Virginia. He used the "median" because he considered it the most valid to show "typical" compensation. Mr. Kennedy defined the "median" as the point in the middle, where half the compensation is above and half the compensation is below. The "mean" is an average of all compensation. Mr. Kennedy considered Gene to be the equivalent of a chief executive officer (CEO) and Guy to be the equivalent of a chief operating officer (COO). He assumed that both Gene's and Guy's job performances were excellent.

Mr. Kennedy found that Gene's total cash compensation in 2011 of $1,257,100 was 3.25 times greater than CEOs in the 50th percentile and 1.94 times greater than those in the 90th percentile. Guy's total cash compensation in 2011 of $560,800 was 2.03 times greater than COOs in the 50th percentile and 1.23 times greater than those in the 90th percentile. Mr. Kennedy testified that most companies will compensate their executives up to the 75th percentile if their performance is exceptional. He found that, over a ten year period, Gene's compensation was $4,481,000 over the 75th percentile and Guy's compensation was $755,400 over the 75th percentile.

Mr. Kennedy testified that the bonuses that Gene and Guy pay themselves are "really excessive." Bonuses are usually expressed as a percentage of the base salary. Typical bonuses are 33% of the base salary at the 50th percentile. Even at the 90th percentile, a bonus would generally be no more than 58% of the base salary. By comparison, Gene's bonus is 252% of his base salary and Guy's bonus is 298% of his base salary. Gene's and Guy's bonuses do not vary from year to year, whereas bonuses usually vary

annually based on the performance of the company. Mr. Kennedy testified that Gene's and Guy's bonuses are more than $1,000,000 higher than the 90th percentile.

Lee Weisiger was the Defendant's expert on executive compensation. He, too, considered Gene to be the CEO and Guy to be the COO. As with Mr. Kennedy, Mr. Weisiger principally relied on the ERI Executive Compensation Assessor data base. He looked at Gene's and Guy's compensation for a twelve year period and compared it to the compensation of CEOs and COOs in primarily public companies in the mining sector. He opined that, when compared to the ERI 95th percentile, Gene's and Guy's compensation was below the market average and reasonable. Mr. Weisiger testified that the ERI 95th percentile is used to determine the maximum reasonable compensation for tax deduction purposes. He offered no opinion about Gene's and Guy's job performance, saying that was beyond his expertise. He also lumped together Gene's and Guy's compensation rather than consider them individually. He did not consider salaries separate from bonuses. Mr. Weisiger compared Gene's and Guy's compensation to the mean, not the median.

In general, the court found Mr. Kennedy's testimony to be more persuasive and consistent. Mr. Kennedy's focus on cash compensation was reasonable in that non-cash compensation such as stock options is not a major component of compensation in private, closely held companies. (Gene and Guy do not need stock options, for example, to motivate them as they already own 100% of the voting stock of Disthene.) Mr. Kennedy's use of the median appears to be a more sound approach than Mr. Weisiger's use of the mean. Mr. Weisiger's use of the ERI 95th percentile appears unreasonable to the court. The question before the court is not whether Gene and Guy are paid more than the maximum amount of compensation considered reasonable for federal income tax purposes, but whether their compensation is excessive in determining whether they are being fair to the company and its minority shareholders.

In sum, the court agrees with the Plaintiffs that Gene's and Guy's compensation is excessive when compared to the compensation of comparable officers at other companies.

Of course, the comparison of the compensation in question to that of comparable officers at other companies is only one of the factors listed in Giannotti for determining whether executive compensation is excessive. Other factors include the qualifications of the employee, the nature, extent, and scope of the employee's work, the type of services rendered, the difficulties involved in discharging responsibilities; success of the business, comparison between salary paid to the corporation's net income, and similar relevant factors.

The court finds that Gene's and Guy's compensation is excessive when compared to the corporation's net income. As Mr. Weisiger testified, their bonuses alone exceeded the corporation's net income from 2005 to 2010.

Giannotti also cites "success of the business" as a factor in determining the reasonableness of executive compensation. Certainly, Disthene's core business of operating the mine (through Kyanite) has been successful. Nevertheless, Disthene could be operated more profitably if Gene and Guy did not intentionally depress the profitability of Blue Rock and the Cavalier Hotel, as will be discussed below.

The other factors cited in Giannotti, such as the employees' qualifications, experience, and scope of work, weigh in favor of the Defendant's position that the executive compensation of Gene and Guy is not excessive.

On the whole, having considered all of the Giannotti factors and the expert testimony on the subject, the court concludes that the executive compensation of Gene and Guy is excessive and is evidence of oppression of the minority shareholders.

*Favoring the Interests of Gene's Immediate Family*

Gene promised his sister Jeanne on her deathbed that he would take care of Sharon and Curtis and treat them fairly. Yet, shortly after Jeanne died, and without explanation, Sharon was fired from her minimum wage, non-management job at the Cavalier Hotel and evicted from company-provided housing. When Curtis graduated from college in 2001 with a degree in economics, he asked Gene for a job at the Cavalier Hotel, saying he wanted to learn the business from the ground up. Gene flatly refused and suggested that Curtis seek employment at the Hilton Hotel.

Gene showed no such reluctance to employ members of his own family. Guy became vice president and general manager of the old Kyanite Mining Corporation three years after graduating from college. When the company was reorganized in 2005, Guy became the president and a director of Kyanite, a director of Disthene, and a manager of Blue Rock. Gene's daughter Vail was named president of Blue Rock at the age of twenty-five, at a salary of $60,000. Vail ceased being president of Blue Rock in 2009 and became in charge of "special projects" for the company. Her salary did not decrease when she was no longer president of Blue Rock. In addition, she receives $10,000 a year as a manager of Blue Rock. Gene's younger son Arch was named a director of the Cavalier Hotel Corporation, earning $10,000 a year in that position. Arch is also employed at the hotel doing a variety of jobs for which he receives a modest hourly wage. Gene's wife, Barbara, receives $10,000 a year in director fees in her capacity as a director of the Cavalier Hotel Corporation. There is no member of Gene's immediate family who does not derive income from employment by Disthene or one of its subsidiaries.

Professors O'Neal and Thompson cite similar behavior as a technique to squeeze out minority shareholders:

> The squeezers may cut off a flow of income for the minority by refusing to declare dividends or they may deprive minority shareholders of corporate offices and of employment by the company. At the same time, the squeezers can protect their own income stream from the business by exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives. . . .

O'Neal and Thompson, *supra*, at § 3:2.

Professor Johnson, the Plaintiffs' expert on corporate governance issues, testified that it is a common practice for the majority intent on oppressing minority shareholders to "[p]ut yourself on the payroll. Put your family members on the payroll. Pay yourself and your family directors fees."

The court finds that Gene's favoring the interests of his immediate family, while at the same time refusing even low-level corporate employment to Sharon and Curtis, is evidence of oppression within the meaning of Va. Code § 13.1-747.

### Use of Corporate Assets Without Fair Compensation to Disthene

A considerable amount of evidence was adduced at trial that Gene and his side of the family fail to observe appropriate distinctions between the assets and finances of Disthene and their personal finances. The Plaintiffs assert that there is "virtually no separation between the company's business and Gene's personal lifestyle and property." Plaintiffs' Corrected Proposed Findings of Fact and Conclusions of Law ¶ 548. This complaint harks back to the observations of Professors O'Neal and Thompson about the high-handed, autocratic controlling shareholder "who completely ignore[s] customary corporate procedures and paraphernalia." See O'Neal and Thompson, *supra*, § 2:7.

For example, Gene and Barbara regularly use a beach house owned by the Cavalier Hotel without paying any rent or paying only nominal rent that is far below market value, Gene uses the corporate plane for personal trips and family vacations, Gene and his family eat thousands of dollars worth of meals at the Cavalier Hotel each year while paying only a fraction of their cost, Disthene's accountants prepare the personal tax returns of Dixon family members and sometimes charge their fees to the company, and company employees regularly tend to the personal business of Dixon family members while on company time and without being compensated by the Dixons for the personal services.

For many years, the company maintained what it referred to internally as the "122 account." The 122 account was used to keep track of some of the personal expenses of the Dixon family that were charged to the company. The company would bill the family members for the expenses and the company would eventually be reimbursed. Many of the expenses were minor, but some were major. The company, for example, purchased a $17,500 vehicle for Guy's personal use. Guy repaid the company nine months later. Guy acknowledged that this was in effect an interest-free loan from the company.

Approximately 70% of the expenses that were run through the 122 account related to Mallie. Mallie was disabled the last ten years of her life. The expenses of her round-the-clock caregivers were paid by the company and reimbursed by Mallie's trust. Sharon and Curtis learned of this arrangement during the Trust Litigation. As part of the settlement of the Trust Litigation in 2009, they agreed that the practice would continue "in the interests of taking care of Grandma and family harmony."

Gene is the owner of an historic home, Chellowe, in Buckingham County. Guy owns a property known as Rosney. In addition, Gene, Arch, Vail, and family limited partnerships own other real property throughout the area. For many years, pursuant to a series of "farm leases," Blue Rock employees have been allowed to farm Gene's and Guy's land. In return, Blue Rock performs services and favors for Dixon family members as needed at their properties. Gene described this as a barter arrangement. The favors include cutting grass, mulching, fertilizing, bush hogging, managing hunting leases, managing timber, digging ditches, moving trees, moving cattle, selling cattle, improving roads, and organizing hunts. One Blue Rock employee acts as a gamekeeper for Gene's quail. Guy ended this arrangement for his property in 2008, preferring to do it himself. At one time, Blue Rock had a similar arrangement with Guy's father-in-law, who owned a nearby estate. All of these activities are performed as part of Blue Rock's "farming operations." As will be discussed in greater detail below, Blue Rock's farming operations lose, on average, $200,000 per year.

Mr. Whelan, the Plaintiffs' expert forensic accountant, performed a forensic evaluation of the company in an attempt to quantify the extent of the self-dealing of the Dixon family. He conservatively estimated the annualized amount of the value of the personal expenses of the Dixon family paid for by Disthene was $116,801 (excluding the amount of $163,700 related to insurance premiums paid for by Disthene that will be discussed in greater detail below). See P's Ex. # 910. Mr. Whelan found the family's use of corporate assets to be material and demonstrative of a pattern of behavior that is detrimental to the shareholders.

The Defendant's expert forensic accountant, Raymond Peroutka, offered a critique of Mr. Whelan's conclusions. Mr. Peroutka testified that the family's incidental use of corporate assets for their personal purposes was

not material and is properly characterized as non-cash compensation to Gene and Guy.

Except for the use of the 122 account to pay for Mallie's care (a practice that was ratified as part of the settlement of the Trust Litigation), the court finds that Gene's and his family's use of company assets for personal purposes constitutes a misapplication and waste of corporate assets within the meaning of Va. Code § 13.1-747.

### Use of Corporate Funds for Non-Business Purposes

Disthene has paid over $6,590,000 in premiums for life insurance policies that are owned by trusts established for the benefit of Gene's children and grandchildren. The parties disagree about whether these expenditures were for a valid business purpose.

In 2000, Disthene purchased two policies from John Hancock insuring the lives of Gene and his wife Barbara. One of the policies was later surrendered. There remains a "last to die" John Hancock policy insuring both Gene and Barbara. The policy is owned by a trust established by Gene and Barbara to benefit their children and grandchildren. The death benefit under the policy is $17,887,238. As of March 30, 2012, Disthene has paid $1,726,365 in premiums for this policy. See D's Ex. # 575, p. 23. Elizabeth Steger, a director of Disthene, testified that Disthene pays $135,000 a year in premiums on this policy. Disthene's board does not approve this expenditure on an annual basis. Originally, this policy was subject to a split dollar arrangement with the company, but it was later converted to a loan regime when the tax laws changed. Under the loan regime, the company's payments of the premiums are treated as loans to the trust. The trust signs promissory notes to Disthene in the amount of the premiums paid. When the insured dies and the death benefit is paid to the trust, the trust will repay the loans (i.e. premiums) to the company, along with interest. Mr. Whelan, the forensic accountant, testified that Disthene incurs a tax liability of $28,500 per year on the interest that is accruing on the loans to Gene's and Barbara's trust. The promissory notes between the trust and Disthene relieve the trustee, the settlor, and the beneficiaries of any liability on the notes. Disthene must look solely to the trust for repayment. From 2000 until July 2010, there was no collateral assignment from the trust to Disthene for this policy. This put the company at risk that the loans would never be repaid. A collateral assignment is now in place that will give the company first call on any death benefit. Jeri Turley, Disthene's insurance broker, testified that the goal of Gene's and Barbara's policy is to provide liquidity for the insured's estate and enhance the asset value for the heirs. Gene testified that the purpose of the policy is to provide enough liquidity to the trust to enable the trust to purchase Gene's stock or pay the estate taxes, thus ensuring that the stock remains on Gene's side of the family.

Disthene also purchased a $10,000,000 policy from Pacific Life insuring Guy's life. The policy is owned by Guy's trust. The policy is now paid up. Disthene paid the premiums of approximately $300,000 a year from 2002 through 2005. As of March 30, 2012, Disthene has paid $1,190,118 in premiums for this policy. See D's Ex. # 575, p. 23. Originally, this policy was subject to a split dollar arrangement with Disthene, but it was later converted to a loan regime. The promissory notes for the loans made to Guy's trust relieve the trustee, settlor, and beneficiary of any obligation to repay. Gene, who is the trustee of Guy's trust, testified that the purpose of the policy is to provide liquidity to Guy's estate so that his children can buy his stock, thus preventing the stock from being offered to the public.

Mr. Whelan, the Plaintiffs' forensic accountant, found no business purpose for Disthene's payment of the premiums on Gene's and Barbara's life insurance policy or on Guy's policy. Mr. Whelan considered the company's payment of the premiums to be another incidence of the Dixons' self-dealing. Mr. Peroutka, the Defendant's forensic accountant, testified that there is a business purpose for the policies. He considered them to be a component of non-cash compensation to Gene and Guy, the business purpose of which is to retain Gene and Guy as executives of the company.

Ms. Turley, Disthene's insurance broker, testified that one reason that the trusts rather than the company own the insurance policies is to depress the value of the company. If the policies were structured as keyman policies, the death benefit would go to the company and increase the value of the company.

Guy testified that the company's payment of life insurance premiums was also a method to move cash out of the company to avoid possible liability for the accumulated earnings tax. The accumulated earnings tax is a "special tax imposed on corporations that accumulate (rather than distribute via dividends) their earnings beyond the reasonable needs of the business." *Black's Law Dictionary* 22 (6th ed. 1990). See also 26 U.S.C. § 531.

In 1993, Disthene purchased a split-dollar policy from Security Life of Denver insuring Mallie's life. The death benefit was $8,500,000. The company paid a premium of $3,674,857. Mallie was not an officer, director, or employee of Disthene or any of its subsidiaries. At that time, she was a major stockholder of the company and thus the company had an "insurable interest" in her life. Mallie's policy was always subject to a split dollar arrangement with Disthene. It was never converted to a loan regime. Gene testified that the purpose of the policy was to fund a cross-purchase agreement (P's Ex. # 107) so that Gene, as trustee for his children, would have enough funds to purchase Disthene's stock from the marital trust upon Mallie's death. According to Gene, "the purpose was to keep stock in the family." The company also had a second keyman policy on Mallie's life. Ms. Steger, a director of Disthene, testified that she knew of no business purpose for Disthene's purchase of a life insurance policy covering Mallie.

Guy testified that he did not know of the business purpose for the company to pay the premiums on Mallie's life insurance. When Mallie died in 2010, the company received $5,875,541 from the two policies. The purchase of life insurance on Mallie's life was never approved by Disthene's board.

In connection with the Trust Litigation, Sharon and Curtis learned about the insurance policies on Mallie's life. As part of the settlement of the Trust Litigation, they agreed that the policies would remain in the "best interests of Grandma." They did not know, however, that Disthene's board never approved the purchase of the policies.

Previously, Disthene purchased two policies on Gene's life, one from Security Life of Denver and one from Prudential. Gene surrendered both of these policies in 2002, when the cash surrender value was less than the premiums paid. As a result, the company lost $366,838 on these policies.

David Wexler testified for the Defendant as an expert in business insurance. He opined that split dollar life insurance policies are a common executive benefit in a closely held company such as Disthene. He reviewed the loan agreements and the promissory notes between Disthene and the various trusts and found nothing atypical. Mr. Wexler offered no opinion that the policies were fair and reasonable to the corporation, only that they were a common executive benefit. Similarly, Ms. Turley, the insurance broker, testified that split dollar life insurance policies are common benefits at private companies in Virginia.

The purchase of these life insurance policies with Disthene's funds were conflicted transactions. Accordingly, the Defendant has the burden of proving that the policies were fair to Disthene. Disthene has offered no such evidence. Mr. Wexler specifically said he had no opinion on whether the policies were fair and reasonable to Disthene. At best, Disthene has shown only that company-paid life insurance policies on executives' lives are a common executive benefit. Mr. Peroutka testified that the business purpose of the policies was to retain Gene and Guy. Gene testified, however, that "Guy and I do not need to be motivated to stay."

The court concludes that the overriding purpose of these policies was to provide liquidity to the estate of the insured so that the stock owned by the insured remains on Gene's side of the family. A second purpose was to deplete cash from the company in order to keep the per share value depressed, again for the purposes of minimizing Gene's and Guy's estate taxes. A third purpose was to move money out of the corporation to the Dixon side of the family without paying dividends that would have to be distributed *pro rata* to all shareholders. Professor Lyman Johnson, the Plaintiffs' expert on corporate governance issues, observed that the common techniques employed to disadvantage minority shareholders all have one theme, to take money out of the company, but not in the form of a dividend that has to be shared *pro rata* with the shareholders. All of these purposes were primarily personal to Gene and Guy, and they certainly did not justify

the expenditure of $6,590,000 of Disthene's funds. See, e.g., *Flippo v. CSC Associates*, 262 Va. 48, 547 S.E.2d 216 (2001) (corporate directors are not entitled to the benefit of the business judgment rule when their decisions are not made to further their good faith belief of what is in the best interests of the company, but instead are made to further their personal estate plans). Accordingly, the court finds that the company's payment of the insurance premiums constituted misapplication and waste of corporate assets within the meaning of Va. Code § 13.1-747.

### Failing to Operate Blue Rock
### and the Cavalier Hotel for Profit

The Plaintiffs contend that Disthene intentionally fails to operate Blue Rock and the Cavalier Hotel as profitable businesses. According to the Plaintiffs, the failure to maximize the profitability of these subsidiaries constitutes waste and misapplication of assets within the meaning of Va. Code § 13.1-747.

Blue Rock owns 28,000 acres of land. Of that amount, 26,000 acres is timberland and 2,000 acres is farmland. In 2011, Blue Rock's holdings were assessed at $41,400,000 for real estate tax purposes. Ms. Steger, a director of Disthene, testified that she does not know what the business purpose is for Blue Rock holding its land. She does not know whether Blue Rock has made any profit.

Blue Rock loses money each year on its farming operations. Mr. Whelan testified that the farming operation has lost $2,000,000 over the last ten years. Benjamin Gormus, the president of Blue Rock, agrees that the farming operations lose about $200,000 a year. Guy stated that the company maintains its farming operations in part because it has been a tradition of the company since the days of his grandfather, Gene Senior, and great-grandfather, Guy A. Dixon. The only business justification for keeping the farming operations offered at trial was that it maintains the farming skills of Blue Rock's employees for later use in mine reclamation efforts. Guy acknowledged that "[t]here is a case to be made to stop the farming."

Also of concern to the Plaintiffs is Blue Rock's management of its timberlands. Mr. Gormus, the president of Blue Rock, testified that the company controls the revenue derived each year from the timbering operations. He stated that, "[i]f we wanted to make a profit on Blue Rock on an annual basis, we could." Similarly, Gene testified that "[w]e could timber the land and make a profit." Instead, Blue Rock cuts just enough timber each year to break even. Mr. Gormus determines how much timber to cut in order to pay Blue Rock's real estate taxes and salaries and to cover the losses from the farming operations. Actually, Blue Rock fails to break even many years. Blue Rock has lost on average $70,000 a year since its inception in 2005.

314

Blue Rock does not try to make a profit because Gene's goals are to promote wildlife and good wildlife habitat. "Quail and turkey are especially important." P's Ex. # 862. In addition, Gene does not want to cut hardwoods unless it is necessary. Gene testified that he believes management of wildlife is beneficial to shareholders. Mr. Gormus testified that "[w]e manage for wildlife in part because Gene likes to hunt. He likes to hunt quail." One of Blue Rock's activities is to manage a private game preserve for Gene.

Blue Rock's internal estimation of the value of its timber is $23,669,000 as of February 2011. Gavin Harless, the Plaintiffs' timber expert, valued that portion of Blue Rock's timber that he inspected as worth $11,905,000.

Mr. Harless opined that a large portion of Blue Rock's trees are "over mature" for timbering purposes. That is, they have been allowed to age beyond the optimal period where, if cut, they would yield the maximum value. He considered that to be "waste."

John Bullock testified as an expert on behalf of the Plaintiffs. He is the president of Gaddy Engineering, which manages 400,000 acres of mining and timbering land. Mr. Bullock quantified the "waste" on the timberland that Mr. Harless was able to inspect at $3,796,935.

Mr. Gormus testified that Blue Rock manages the timber for the objective of its parent company, that is, as a long-term investment. Gene testified that Blue Rock is a real estate investment. Most years it does not make any profit, but the value of its assets is increasing for the benefit of shareholders. Michael Lewis, the Defendant's expert forester, testified that Blue Rock is getting a good return on its timber assets.

Guy testified that Blue Rock is not operated to make a profit because it is intended to be a "savings account" or a "rainy day fund" for Disthene. According to Guy, the business purpose for Blue Rock is to provide a source of funds for future business opportunities and for future liabilities when Kyanite incurs reclamation costs connected with the eventual closing of the mine. Guy testified that "I have always looked at Blue Rock as a piggy bank to pay for the reclamation costs."

The Plaintiffs also contend that the Cavalier Hotel is intentionally operated so as not to make a profit. Ms. Steger, a director of Disthene, does not know the business reason to keep the Cavalier Hotel. She does not know if the hotel is profitable.

In fact, the Cavalier Hotel loses money each year. Guy has described the Cavalier Hotel as a "profit destroying asset" and a "tar-baby-like venture." Guy testified that the Cavalier Hotel makes a lot of money in the summer and loses money in the winter. He said it comes out more or less as break even. Apparently, the hotel is capable of turning a profit. Gene testified that the hotel "will be profitable to the stockholders any time we choose it to be. It will be up to us."

Larry Henry testified as an expert appraiser, experienced in the appraisals of hotels. He found that the Cavalier Hotel had a fair market

value of $16,400,000, including the value of what he termed "excess land." According to Gene, at thirty-six acres (more or less), the hotel is the "largest parcel of land in private hands on the beach." Disthene internally values the hotel at $25,000,000. The City of Virginia Beach has assessed it as being worth $41,000,000 for real estate taxation purposes.

Mr. Henry found the hotel to be in only fair to good condition. He opined that renovation is needed. He found that the Cavalier Hotel performs poorly compared to other hotels in Virginia Beach. It has a 27% occupancy rate, while other hotels in the area enjoy a 50% occupancy rate.

The Cavalier Hotel owes Disthene $2,700,000 for money Disthene has advanced it over the years. Disthene has been paid no interest on this loan.

Gene testified that the hotel has been a satisfactory real estate investment. He believes that Disthene's shareholders benefit from the company's ownership of the hotel. Gene disagrees with Guy that the hotel is a "profit destroying asset." In Gene's view, the hotel provides tax benefits to Disthene. Because the company files consolidated returns, the Cavalier Hotel's losses depress Disthene's net income. Mr. Peroutka, the Defendant's forensic accountant, testified that the benefit of the Cavalier Hotel is that it generates a tax loss.

Guy believes that the Cavalier Hotel serves the same purpose as does Blue Rock, to provide funds to Disthene for its future obligations. Guy stated that he continues to believe that the Cavalier Hotel is a "profit destroying asset" but he values it as a "piggy bank for other things we want to do."

Having considered all of the evidence adduced at trial about the operations of Blue Rock and the Cavalier Hotel, the court concludes that the Plaintiffs have not shown that the management of the properties with little concern for making an immediate profit amounts to "waste" within the meaning of Va. Code § 13.1-747. The general rule is that corporate directors have the authority to set a corporate course of action, including the time frame, designed to enhance corporate profitability. There is no per se duty to maximize shareholder value in the short term. *Paramount Communications, Inc. v. Time*, 571 A.2d. 1140, 1150 (Del. 1989). See also *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986) (when a decision to sell a corporation is made, directors have a duty to maximize value for shareholders). Gene and Guy have breached no duty to the shareholders by making the business decision primarily to hold Blue Rock and the Cavalier Hotel for future uses.

### Withholding Corporate Information from Minority Shareholders

The Plaintiffs complain that they have been disadvantaged by Disthene's refusal to provide them with meaningful corporate records when requested.

The evidence adduced at trial was that Disthene does not eagerly provide Sharon and Curtis with corporate records. Nevertheless, it eventually has provided them with all the records that they are entitled to receive by law.

The Plaintiffs' primary complaint is that, at a meeting in February 2010, Disthene promised to give them more records than required by law and later reneged on that promise. Disthene justifies its about-face because, at that meeting, Sharon and Curtis threatened to sue Disthene. Disthene maintains that requesting records for the purpose of instituting a lawsuit is not a proper purpose under Va. Code § 13.1-771(C)(2). *Retail Prop. Investors v. Skeens*, 252 Va. 36, 471 S.E.2d 181 (1996).

The Plaintiffs also complain that Disthene intentionally conducts its corporate affairs so as not to create any records that they would be entitled as shareholders to receive. Disthene does not invite non-voting shareholders to annual shareholders meetings. Gene testified that he does not invite Class B shareholders to annual meetings because he believes in small and quick decisions. "I do not want to have a group of people standing around who have no input." Disthene, the Cavalier Hotel Corporation, and Kyanite no longer have meetings of directors. Blue Rock no longer has formal meetings of its managers. On the advice of counsel, all four corporations operate entirely by unanimous consents in lieu of meetings. Ms. Steger, the corporate secretary for Disthene and each of its three subsidiaries, takes no notes of any informal meetings that the officers, directors, or managers might have.

Although the Plaintiffs are not satisfied with Disthene's level of responsiveness to their requests for corporate records, the Plaintiffs have failed to identify any governing corporate document or applicable Virginia law that Disthene has violated. Therefore, the court does not find that Disthene's failure to give Plaintiffs more records than they are entitled to receive is a basis for the judicial dissolution of Disthene.

## Conclusion

Non-voting shareholders in a closely held corporation are inherently disadvantaged. They have no voice in the management of the company. They have no market for their shares should they desire to sell. But they are not without rights. They have the right to be treated fairly by the corporate officers and directors in accordance with the officers' and directors' fiduciary duties. They have the right to inspect the corporate books and records. The non-voting shareholders in Disthene have the right to "share and share alike" with the voting shareholders in any dividends or distributions upon liquidation. If these limited rights are denied them, they have the right to seek legal recourse.

The Plaintiffs have not been treated fairly by Disthene and its management. They have instead been treated as irksome interlopers, problems to be dealt

with, preferably by squeezing them out at a below market price, or slashing their dividends in the hope of depriving them of the financial wherewithal to seek legal recourse. There is no reason to believe that the management of Disthene will ever treat the Plaintiffs fairly. For example, the judge in the Trust Litigation found that Gene violated the terms of the settlement agreement. Although not held in contempt, Gene was replaced as trustee of the marital trust that was the subject of the litigation. The court concludes that dissolution, although a drastic remedy, is the appropriate remedy in this case for the long-standing oppression of shareholders, as well as waste and misapplication of corporate assets.

For the forgoing reasons, the court will enter an order denying the Defendant's motion for summary judgment and granting the Plaintiffs' request that The Disthene Group, Inc., be dissolved pursuant to Va. Code § 13.1-747. The court will appoint a receiver as permitted by Va. Code § 13.1-748 to wind up and liquidate the business and affairs of the corporation. The court will hold a hearing, as required by Va. Code § 13.1-748(A), before selecting the receiver. Counsel should confer and advise the court of a proposed date for that hearing without delay.

*Attachment A*

*Dixon Family Tree*

Guy A. Dixon
(d. 1980)

Gene Dixon, Sr.
(d. 1974)
m. Mallie M. Dixon
        (d. 2010)

Gene Dixon, Jr.                          Jeanne Dixon
(b. 1943)                                (b. 1941, d. 1988)
m. Barbara Dixon                         m1. Mr. Newcomb
                                           m2. Marion J. ("Boyd")
                                           Colgate, Sr. (b. 1925)

Guy B.      Erica      Arch      Sharon      Curtis
Dixon       ("Vail")   Dixon     Marie       Dixon
            Dixon                Newcomb     Colgate
                                 (b. 1964)   (b. 1979)

*Attachment B*

*Shareholders of The Disthene Group, Inc.*
*(as of 12/27/2010)*

| Shareholder | Number of Class A Shares | Number of Class B Shares | Percentage of Outstanding Shares (rounded to the nearest one-hundredth of a percent) |
| --- | --- | --- | --- |
| Gene Dixon | 5,730.00 | | 9.41 |
| Guy Dixon | 20.00 | 6,141.60 | 10.12 |
| Arch Dixon | | 4,287.0 | 7.04 |
| Erica Vail Dixon | 2,346.53 | | 3.85 |
| Disthene Limited Partnership | 6,671.00 | | 10.96 |
| Gene Dixon, as Trustee (Arch) | 1,940.53 | | 3.19 |
| Gene Dixon, as Trustee (Vail) | 3,881.07 | | 6.37 |
| Sub Total (Dixon) | 5,750 | 25,267.80 | 50.94 |
| Peaceful Valley | | 11,643.20 | 19.13 |
| Sharon Newcomb | | 7,067.50 | 11.61 |
| Curtis Dixon Colgate | | 6,503.50 | 10.68 |
| Boyd Colgate, as custodian for Curtis Dixon Colgate | | 564.00 | .93 |
| Subtotal (Colgate) | | 25,778.20 | 42.35 |
| Daniel W. Dixon | | 50.00 | .08 |
| Cheryl Kay | | 2,458.00 | 4.04 |
| Ronald L. Morris | | 150.00 | .25 |
| Willard Bailey | | 150.00 | .25 |
| Lorene Kay | | 171.00 | .28 |
| George V. or Uva R. Conner | | 50.00 | .08 |

| | | | |
|---|---|---|---|
| Trust U/W Billy R. Coleman | | 550.00 | .90 |
| Mae Harvey Blank | | 166.00 | .27 |
| Dorothy F. Harvey | | 43.00 | .07 |
| Patricia Stone | | 123.00 | .20 |
| Myrna Rooks | | 166.00 | .27 |
| Subtotal (Others) | | 4,077 | 6.69 |
| Total Outstanding | 5,750.00 | 55,123.00 | 99.98 (Total does not equal 100% because of rounding.) |

*Attachment C*

*The Disthene Group, Inc.,*
*and its Subsidiaries Officers, Directors, and Managers*

The Disthene Group, Inc.

> President: Gene Dixon
> Secretary: Elizabeth Steger
> Directors: Gene Dixon, Guy Dixon, Elizabeth Steger

Kyanite Mining Corporation

> President: Guy Dixon
> Vice President & General Manager: Herbert Jones
> Controller: Ronald Hudgins
> Secretary: Elizabeth Steger
> Directors: Gene Dixon, Guy Dixon, Herbert Jones, Ronald Hudgins,
> Joseph Jamerson

Blue Rock Resources, L.L.C.

> President: Benjamin Gormus
> Secretary: Elizabeth Steger
> Managers: Guy Dixon, Vail Dixon, Benjamin Gormus

Cavalier Hotel Corporation:

> President: Daniel Batchelor
> Secretary: Elizabeth Steger
> Directors: Barbara Dixon, Arch Dixon, Daniel Batchelor

■■■■■■■■■■■■

*Attachment D*

*The Disthene Company Executive Compensation*
*1997 to 2011*

|      | Gene's Salary | Gene's Bonus | Gene's Total | Guy's Salary | Guy's Bonus | Guy's Total |
|------|---------------|--------------|--------------|--------------|-------------|-------------|
| 1997 |               |              |              | 1,287,901    |             | N/A         |
| 1998 |               |              |              | 1,302,759    |             | 206,520     |
| 1999 |               |              |              | 1,103,650    |             | 356,408     |
| 2000 |               |              |              | 811,045      |             | 463,852     |
| 2001 | 261,000       | 550,000      | 811,000      | 88,900       | 375,000     | 463,900     |
| 2002 | 266,300       | 375,000      | 641,300      | 95,100       | 232,500     | 327,600     |
| 2003 | 266,300       | 435,000      | 701,300      | 97,000       | 257,100     | 354,100     |
| 2004 | 266,300       | 330,000      | 596,300      | 95,600       | 176,000     | 271,600     |
| 2005 | 281,900       | 330,000      | 611,900      | 100,100      | 171,800     | 271,900     |
| 2006 | 293,000       | 750,000      | 1,043,000    | 110,100      | 375,000     | 485,100     |
| 2007 | 300,300       | 900,000      | 1,200,300    | 117,900      | 445,000     | 562,900     |
| 2008 | 321,600       | 900,000      | 1,221,600    | 126,700      | 435,000     | 561,700     |
| 2009 | 334,300       | 900,000      | 1,234,300    | 133,200      | 420,000     | 535,200     |
| 2010 | 326,700       | 900,000      | 1,226,700    | 126,800      | 420,000     | 546,800     |
| 2011 | 357,100       | 900,000      | 1,257,100    | 140,800      | 420,000     | 560,800     |